609 A.2d 1248

IN THE MATTER OF THE "PLAN FOR ORDERLY WITHDRAWAL FROM NEW JERSEY" OF TWIN CITY FIRE INSURANCE COMPANY.

Argued March 17, 1992—Decided July 29, 1992.

*Taylor R. Briggs,* a member of the New York bar, argued the cause for appellants Twin City Fire Insurance Company, Hartford Fire Insurance Company, Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Underwriters Insurance Company, Hartford Insurance Company of the Midwest, Hartford Insurance Company of Connecticut, New England Insurance Company, Hartford Life and Accident Insurance Company, and Hartford Life Insurance Company (*LeBoeuf, Lamb, Leiby & MacRae,* attorneys; *Taylor R. Briggs* and *Wesley S. Caldwell, III,* of counsel; *Taylor R. Briggs, Wesley S. Caldwell, III, Laura B. Barry, James R. Martino* and *Stephen H. Orel,* on the briefs).

*Jack M. Sabatino,* Assistant Attorney General, argued the cause for respondent Commissioner of Insurance (*Douglas S. Eakeley,* Acting Attorney General of New Jersey, attorney; *Jack M. Sabatino* and *Carol Johnston,* Deputy Attorney General, on the brief).

*Elmer M. Matthews* argued the cause for *amicus curiae* American Insurance Association (*Clapp & Eisenberg,* attorneys; *Elmer M. Matthews* and *Frederic S. Kessler,* on the brief).

*Deborah T. Poritz* submitted a letter in lieu of brief on behalf of *amici curiae* State Farm Mutual Automobile Insurance Company, State Farm Fire and Casualty Company, State Farm

General Insurance Company, State Farm Life Insurance Company, and State Farm Annuity and Life Insurance Company (*Jamieson, Moore, Peskin & Spicer*, attorneys).

*John J. Degnan*, General Counsel, submitted a letter in lieu of brief on behalf of *amici curiae* Chubb Insurance Company of New Jersey, Federal Insurance Company, Vigilant Insurance Company, Pacific Indemnity Company, Great Northern Insurance Company and Chubb Custom Insurance Company.

The opinion of the Court was delivered by

STEIN, J.

Twin City Fire Insurance Company (Twin City) challenges the constitutionality of the order issued by the Commissioner of Insurance (Commissioner) conditioning the termination of its authority to write insurance in New Jersey. Twin City objects primarily to two conditions: the so-called "forfeiture" condition, which requires that the separate corporations affiliated with Twin City as members of the ITT Hartford Group, Inc. (ITT Hartford) surrender their respective certificates of authority within five years and withdraw from the state; and the so-called "new-business condition," which requires that during its withdrawal from the state over a five-year period Twin City comply with existing laws, including those provisions of the Fair Automobile Insurance Reform Act of 1990, *L.*1990, *c.* 8 (the Reform Act or the Act) requiring automobile insurers to participate equitably in the shifting of residual-market insureds to the voluntary market. See *N.J.S.A.* 17:30E–14. In a published opinion, the Appellate Division upheld the Commissioner's order except with respect to a modification consented to by the Commissioner eliminating two life- and health-insurance affiliates from the forfeiture condition, but remanded the matter to the Commissioner to afford Twin City the opportunity to have its withdrawal application reconsidered on the basis of regulations adopted subsequent to the Commissioner's order. 248 *N.J.Super.* 616, 641, 591 *A.*2d 1005 (1991). We granted

Twin City's petition for certification, 127 *N.J.* 548, 606 *A.*2d 362 (1991). We affirm.

I

Twin City is a property-casualty insurer licensed for more than twenty years to transact business in each of the fifty states and the District of Columbia. It has no plan to surrender its license in any jurisdiction other than New Jersey.

Twin City primarily writes private-passenger and commercial automobile insurance in New Jersey. Its 1989 private-passenger insurance premiums aggregated $16.3 million, or 1.032% of that market; its aggregate 1989 commercial-insurance premiums were $49.6 million, representing 13% of the market.

Twin City is a wholly-owned subsidiary of Hartford Fire Insurance Company (Hartford Fire), as are the other six Twin City affiliated companies affected by the Commissioner's order, as modified: Hartford Accident & Indemnity Company; Hartford Casualty Insurance; Hartford Underwriters Insurance Company; Hartford Insurance Company of the Midwest; Hartford Insurance Company of Connecticut; and New England Insurance Company. ITT Hartford is the parent company of Hartford Fire and, derivatively through Hartford Fire, of Twin City and its six affiliated companies. Twin City and its affiliates market their products collectively under common trade names (The Hartford, The Hartford Insurance Group, and ITT Hartford Insurance Group), through independent insurance agencies appointed generally to represent member companies of ITT Hartford. Claims submitted to Twin City and its affiliates are commonly processed by employees of Hartford Fire pursuant to management agreements between Hartford Fire and its respective subsidiary companies. Twin City and its affiliates participate in reinsurance-pooling agreements with other member companies of ITT Hartford. Hartford Fire and the other six Twin City affiliates generated approximately $120 million in aggregate premiums from New Jersey insurance business in

1989, of which approximately $9 million was attributable to private-passenger automobile premiums and the balance to multiple lines of property and casualty insurance.

On March 7, 1990, Twin City tendered its Certificate of Authority for surrender to the Acting Commissioner of Insurance, accompanied by a letter forecasting that the impending adoption of the Reform Act would cause Twin City to incur "devastating losses in future years." The Reform Act was signed by Governor Florio on March 12, 1990. Section 72 of the Act, which applied retroactively to requests by insurers for surrender of Certificates of Authority submitted on or after January 25, 1990, provides:

> An insurance company of another state or foreign country authorized under chapter 32 of Title 17 of the Revised Statutes to transact insurance business in this State may surrender to the commissioner its certificate of authority and thereafter cease to transact insurance in this State, or discontinue the writing or renewal of one or more kinds of insurance specified in the certificate of authority, only after the submission of a plan which provides for an orderly withdrawal from the market and a minimization of the impact of the surrender or discontinuance on the public generally and on the company's policyholders in this State. The plan shall be approved by the commissioner before the withdrawal or discontinuance takes effect. *In reviewing a plan for withdrawal under this section, the commissioner shall consider, and may require as a condition of approval, whether some or all other certificates of authority issued pursuant to chapter 17 or 32 of Title 17 of the Revised Statutes held by the company or by other companies in the same holding company as the company submitting the plan should be surrendered.* The certificate of authority of the company shall be deemed to continue in effect until the provisions of the approved plan have been carried out. The provisions of this section shall apply to any request for withdrawal, surrender or discontinuance filed on or after January 25, 1990. [Emphasis added.]

The Acting Commissioner immediately rejected Twin City's attempted surrender of its license, and informed Twin City that no termination could occur until the Commissioner had approved and Twin City had implemented a plan for orderly withdrawal in accordance with Section 72 of the Act. When Twin City declined to submit such a plan, the Department of Insurance (Department) sought and obtained injunctive relief, and Twin City was ordered to rescind notifications of withdraw-

al it had forwarded to its agents and cease all activities preparatory to termination of its business in New Jersey.

In response, on April 30, 1990, Twin City submitted a plan for orderly withdrawal, effective the following day, in which it proposed to withdraw from private-passenger automobile-insurance business in New Jersey by non-renewing its policies and withdrawing its rating system, retaining the authority to write other forms of insurance in the state. According to the Commissioner's order, Twin City's affiliates simultaneously communicated their intention to withdraw from the private-passenger automobile-insurance market by eliminating their rating systems for that insurance. The sole exception to the affiliates' proposed withdrawal was an automobile- and homeowners-insurance program offered by Hartford Underwriters Insurance Company to members of the American Association of Retired Persons.

Twin City's rationale for its proposed withdrawal from the private-passenger automobile-insurance market, as explicated in arguments opposing the Department's application for injunctive relief, relied on financial projections prepared by Twin City in anticipation of adoption of the Reform Act. Those projections, prepared on the basis of estimated rate increases of 6.4% in 1990 and 8% in 1991 and 1992, calculated that Twin City would sustain underwriting losses in those three years of $3.8 million, $19 million, and $23.5 million, respectively, if it continued its present private-passenger automobile-insurance business.

In his Administrative Decision and Order of August 14, 1990 (No. A90–151), the Commissioner approved Twin City's plan subject to fourteen conditions. In challenging the Commissioner's Order and the constitutionality of Section 72 of the Reform Act in the Appellate Division, Twin City objected specifically to four of the conditions:

A. The "Five Year Condition"

Twin City must attempt to place its private-passenger automobile business with other insurers. If unsuccessful after five

years, Twin City may then issue notices of non-renewal. Twin City cannot withdraw from the market until all of its policies have been placed with other carriers or have expired.

B. The "Other Business Condition"

Twin City shall be required to seek replacement carriers for its other lines of business for a period of five years. After five years Twin City must non-renew any remaining policies in force as they expire.

C. The "Forfeiture Condition"

Twin City's ITT Hartford affiliates must submit orderly plans of withdrawal from their respective markets providing for the termination of their transaction of insurance business within five years.

D. The "New–Business Condition"

During its withdrawal from the private-passenger automobile-insurance business over a five-year period, Twin City must comply with all provisions of the Reform Act including the requirement that it participate proportionately in the shifting of "assigned risk" or residual market insureds to the voluntary market.

The Appellate Division sustained the conditions and upheld the constitutionality of Section 72 of the Act. 248 *N.J.Super.* at 641–42, 591 *A.*2d 1005. The court rejected Twin City's contention that the condition requiring Twin City's affiliates to surrender their licenses within five years was an unconstitutional taking of property without just compensation. In the Appellate Division's view, Twin City's affiliates could retain their respective lines of insurance in New Jersey if Twin City continued to write private-passenger insurance. Hence, the only "loss" mandated by the Act was the potential reduction in profits resulting from Twin City's compliance with the residual market depopulation and other provisions of the Reform Act,

which the court characterized as " 'a slender reed upon which to rest a takings claim.' " *Id.* at 627, 591 *A.*2d 1005 (quoting *Andrus v. Allard*, 444 *U.S.* 51, 66, 100 *S.Ct.* 318, 327, 62 *L.Ed.*2d 210, 223 (1979)). The court also rejected Twin City's substantive-due-process argument, concluding that Section 72 of the Act and the Commissioner's order constituted a rational response to a private insurer's desire to withdraw from the private-passenger market, reflecting the strong governmental interest in encouraging all companies to share the burden of depopulating the residual market and reducing the cost of private-passenger automobile insurance. *Id.* at 630–38, 591 *A.*2d 1005. The court summarily rejected Twin City's equal-protection and Commerce Clause arguments. *Id.* at 639–40, 591 *A.*2d 1005. Finally, the Appellate Division remanded the matter to the Commissioner to permit Twin City to have its withdrawal proposal adjudicated on the basis of the regulations adopted subsequent to the Commissioner's order. *Id.* at 640–41, 591 *A.*2d 1005.

II

A. History and Overview of the Reform Act

A basic familiarity with the events and circumstances that prompted passage of the Reform Act, as well as an appreciation of the Act's anticipated impact on the private-passenger automobile-insurance market, are essential prerequisites to an informed evaluation of the validity of the Commissioner's order. The Act's background and objectives are described comprehensively in *State Farm Mutual Automobile Insurance Co. v. State*, 124 *N.J.* 32, 590 *A.*2d 191 (1991), in which this Court sustained the constitutionality of the Reform Act against a facial challenge. We revisited the subject in *In re Department of Insurance's Order Nos. A–89–119 and A–90–125*, 129 *N.J.* 365, 371–374, 609 *A.*2d 1236 (1992), also filed today. Rather than summarize the critical developments that led to the Re-

form Act, we draw on Justice Handler's careful explanation in our *State Farm* opinion:

For years, New Jersey's system of automobile insurance regulation, like those of many other states, has faced an intractable problem of providing coverage for high-risk drivers. Prior to 1983, drivers who could not obtain coverage directly from insurers in the voluntary market were insured through an Assigned Risk Plan (*N.J.S.A.* 17:29D–1), under which the Commissioner of Insurance apportioned high-risk drivers among all auto insurers doing business in New Jersey. In 1983, the Automobile Full Insurance Availability Act, *N.J.S.A.* 17:30E–1 through –24, replaced the assigned-risk system with the New Jersey Automobile Full Insurance Underwriting Association, commonly known as the Joint Underwriting Association or JUA.

All insurers licensed to write automobile insurance in New Jersey were required to be members of the JUA. The objective of the new scheme was to create a more extensive system of allocating high-risk drivers to carriers, and through the JUA, to provide such drivers with coverage at rates equivalent to those charged in the voluntary market. * * *.

The JUA, a good deal more complex than the prior Assigned Risk Plan, worked as follows. Insurers (and subsequently certain qualified non-insurer entities) could apply to become "servicing carriers," which would bear administrative responsibility for collecting premiums, arranging coverage, and the like, and which would receive fees for such services from the JUA. However, the statute, the Plan of Operation, and the agreements between the JUA and servicing carriers all provided that claims and liabilities of the JUA would be borne by it independently; servicing carriers were to be insulated from such claims and liabilities.

Because the JUA insured high-risk drivers but also required that their rates be the same as voluntary-market rates (see *N.J.S.A.* 17:30E–13), it was anticipated that premium revenues would not cover costs of claims against JUA policies. Therefore, in addition to normal premium income, the JUA was also given income from Department of Motor Vehicle surcharges for moving violations and drunken driving convictions, policy "flat charges," and "residual market equalization charges," or RMECs, to be added to policy rates for voluntary-market insureds. *N.J.S.A.* 17:30E–8. Thus, the JUA was a system in which the insurance costs of high-risk drivers were subsidized by the imposition of fees on segments of the general population of motorists. The JUA was supposed to be operated on a no-profit, no-loss basis, with RMECs increased or decreased as needed to accomplish that result.

However one may view the objectives of the JUA, the system did not achieve its goals. More and more drivers became unable to procure voluntary-market coverage, until by 1988 over 50% of New Jersey drivers had to be insured through the JUA. Claims against JUA insureds were sizeable and greatly exceeded the JUA's available income. Despite the imposition of substantial RMECs from 1988 through 1990, the JUA nonetheless accumulated a deficit of over $3.3 billion in unpaid claims and other losses.

Automobile insurance reform, including the reduction of the cost of insurance, and particularly some plan for eliminating the unwieldy JUA, repaying its debt, and replacing it with a more workable distribution of the automobile insurance market, became a priority for the Legislature and the executive branch in 1990. By March of that year the Reform Act had been adopted.

The principal goals of the Act were to reduce insurance costs for most New Jersey drivers, to depopulate the JUA by switching insureds to the voluntary market, and to create a funding mechanism to pay off the JUA debt. To these ends, the Act provided that the JUA would cease writing or renewing policies as of October 1, 1990. The "depopulation" of the JUA would be accomplished by classifying insured drivers into three categories: (1) high-risk drivers in the (revived) Assigned Risk Plan (10% of the market); (2) "non-standard" risk drivers, who would be insured by private insurers directly, but who could be charged rates up to 135% of those of standard risks (15% of the market); and (3) standard-risk, voluntary-market insureds covered at prevailing rates (the remaining 75% of the market). Presumably, the higher rates now to be charged high-risk and "non-standard" risk drivers should bring the premium income on such coverage in line with actual costs, and this coverage would no longer be subsidized.

There remains, however, the problem of how to pay off the JUA's prior accumulated debt of over $3.3 billion; this, too, is addressed by the Reform Act. The Act creates the New Jersey Automobile Insurance Guaranty Fund (Auto Fund), a separate fund within the State Treasury, to collect and disburse the various payments designed to pay off the JUA debt. Reform Act, Section 23; *N.J.S.A.* 17:33B–5. The Act assigns to the Auto Fund certain sources of income that under the prior scheme went to the JUA, *e.g.*, surcharges for driving violations and drunken driving convictions. It also creates new sources of revenue for the Auto Fund, *e.g.*, fees on lawyers, doctors, and auto body repair businesses, higher automobile registration fees, and, most significant in the context of this litigation, the imposition of additional assessments and surtaxes on insurers.

The assessments imposed on insurance carriers are collected through the Property Liability Insurance Guaranty Association (PLIGA). Reform Act, Section 74, *N.J.S.A.* 17:30A–8a(9). PLIGA was created in 1974 to impose assessments on New Jersey property-casualty insurers to pay claims against carriers that had become insolvent. (*L.* 1974, *c.* 17; *N.J.S.A.* 17:30A–1 through 17:30A–20). The Reform Act requires PLIGA to make additional assessments to be applied exclusively to the JUA debt. These assessments, denominated by the Act as "loans," are paid into the Auto Fund. *N.J.S.A.* 17:30A–8a(10). They are to be set at rates designed to net $160 million per year for eight years (1990 through 1997); for 1990, the assessments represented 2.7% of net premiums of the property-casualty insurers.

Section 75 of the Reform Act, *N.J.S.A.* 17:30A–16, addresses recoupment from policyholders of PLIGA assessments both for insolvencies and for the JUA bailout. Insurers have always been permitted to pass through the insolvency assessments to policyholders. The insolvency passthrough originally was accomplished by rate increases, but in 1979 the method was changed to

direct surcharges on policy premiums. The surcharges for insolvency assessments continue to be authorized under the Reform Act. *N.J.S.A.* 17:30A–16a. However, the Act expressly prohibits such surcharges to recover the new assessments for the JUA bailout. Section 75b states:

> No member insurer shall impose a surcharge on the premiums of any policy to recoup assessments paid pursuant to [the provision requiring assessments to be loaned to the Auto Fund]. [*N.J.S.A.* 17:30A–16b.]

In addition to the new assessments, the Reform Act, Section 76, imposes a special surtax on insurers to go toward the JUA bailout. *N.J.S.A.* 17:33B–49. This surtax is a greater amount, 5% of net premiums, but is imposed for a shorter period (only three years, 1990, 1991 and 1992), than the assessments. The additional surtax is designed to net a total of $300,000,000 over the three-year period into the Auto Fund. Reform Act, Section 77, *N.J.S.A.* 17:33B–50. Because the objective is to secure $300 million in net proceeds, the 5% surtax rate can be adjusted, depending upon the amount of insurers' net premiums. The 5% rate cannot be *exceeded,* and it is theoretically possible that the Director of Taxation could lower the rate; but such a lowering could occur only if automobile insurance net premiums increased significantly, a highly unlikely event given both the supposed premium-reducing effects of the Act and current market conditions. The Reform Act, Section 78, addresses the question of whether the additional surtaxes can be charged to consumers:

> The Commissioner of Insurance shall take such action as is necessary to ensure that private passenger automobile insurance policyholders shall not pay for the surtax imposed pursuant to section 76. [*N.J.S.A.* 17:33B–51.] [124 *N.J.* at 40–45, 590 *A.*2d 191 (citations omitted).]

In *State Farm,* the insurers had argued that those provisions of the Reform Act that prohibited the passthrough to policyholders of the assessments and surcharges imposed by the Act to pay off the JUA's $3.3 billion indebtedness would necessarily cause the insurers to operate at a loss and thus be deprived of a constitutionally-adequate rate of return. We noted, however, that Section 2g of the Act, *N.J.S.A.* 17:33B–2g, which had been added by an amendment introduced when the Reform Act was before the Assembly Appropriations Committee, specifically provided that "insurers 'are entitled to earn an adequate rate of return' " through the ratemaking process. 124 *N.J.* at 57–58, 590 *A.*2d 191. We also observed that "emergency regulations" adopted by the Commissioner while the *State Farm* litigation was pending established a new procedure to afford rate relief to insurers that could demonstrate that payment of the surtaxes and assessments had denied them a fair rate of return. *Id.* at 59–61, 590 *A.*2d 191. Hence, we rejected the facial challenge

to the constitutionality of the Reform Act because we were satisfied that the regulatory provisions for rate relief and the legislative assurance of a fair rate of return demonstrated that the passthrough prohibitions of Sections 75 and 78 of the Act "do not necessarily preclude all insurers from earning a fair rate of return." *Id.* at 61–62, 590 *A.*2d 191. We also note in passing our recent interpretation of the statutory flex-rate-increase provisions, *N.J.S.A.* 17:29A–44, which allow insurers to raise rates without prior regulatory approval. We held that the Commissioner's statutory authority to modify the statewide average rate change does not authorize any reduction in the three-percentage-point rate increase authorized by statute. *Department of Ins.'s Order Nos. A–89–119 and A–90–125, supra,* 129 *N.J.* at 367, 609 *A.*2d 1236.

### B. The Commissioner's Order

The thirty-five page Administrative Decision and Order issued by the Commissioner includes a thorough explanation for the imposition of severe conditions on Twin City's proposed withdrawal. The Commissioner observed generally that New Jersey's private-passenger automobile-insurance market is undergoing "transition and adjustment," primarily because of the burdens imposed on insurers by the Reform Act. The Commissioner noted that a precipitous withdrawal by Twin City would disrupt market stability, and that a gradual withdrawal would allow the voluntary market sufficient time to absorb Twin City's business while simultaneously "adjusting to the reforms imposed by the * * * Act." The Commissioner also observed that Twin City's application could not be considered in a vacuum, citing thirty-two other pending requests for withdrawal submitted since adoption of the Act, and noting that insurers that historically had profited from New Jersey business should be "prevented from leaving * * * in a hasty or disorderly manner."

Concerning the forfeiture condition, the Commissioner preliminarily emphasized the intensity of insurance regulation in New

Jersey and the necessity that he use his regulatory authority to discourage non-renewal of large blocks of business as a component of his regulatory control over market entry and exit. The Commissioner expressed concern that Twin City's withdrawal would exacerbate the difficulty of absorbing insureds from the residual market, a burden that the Reform Act contemplated would be shared by all insurers in order to resolve "a severe crisis in automobile insurance in this State." He implied that Twin City and its affiliates sought to avoid their share of the obligations imposed by the Act while enjoying the benefits of marketing other highly-profitable lines of insurance. The Commissioner pointed out that Twin City's automobile-insurance business historically had been profitable on a national basis, that he assumed that Twin City's automobile business would continue to be profitable under the Reform Act, and that he did not accept Twin City's assertion that its automobile business would be unprofitable. He also cited Twin City's failure to have applied for a prior-approval rate increase since 1988, and its decision not to avail itself of a flex-rate increase for 1989 or 1990. The Commissioner also noted that Twin City could not attribute its planned withdrawal to a hazardous financial condition. The Commissioner observed that if Twin City and its affiliates preferred withdrawal from the private-passenger automobile insurance business, and as a corollary the abandonment of the obligations imposed on all insurers by the Reform Act, then ITT Hartford could not reasonably expect to maintain more-profitable lines of business in New Jersey.

The Commissioner also expressed the view that because continuation of private-passenger automobile insurance is "uniquely in the public interest," the requirement that Twin City's affiliates withdraw from other lines of business would make that business available to other insurers who will be enabled to enhance their profitability. He predicted that the availability of such other business, resulting from the mandated withdrawal of Twin City's affiliates, would encourage existing

companies to remain in and would attract new companies to New Jersey's private-passenger automobile-insurance market.

## III

Before us, Twin City and *amicus curiae*, American Insurance Association, have focused their challenge to the Commissioner's order on two of the fourteen conditions, the "forfeiture condition," requiring Twin City's affiliates to terminate business in New Jersey within five years, and the "new-business condition," which requires Twin City during its withdrawal from New Jersey to comply with the Reform Act and participate equitably in the shift of residual-market insureds to the voluntary market. They attack the new-business condition as a violation of substantive due process, and the forfeiture condition as denying the affiliated companies the equal protection of the laws and as an unconstitutional taking of property without just compensation. *Amicus* also asserts that the forfeiture condition violates the Commerce Clause of the United States Constitution, as well as the so-called "unconstitutional conditions" doctrine. We address each of the arguments in turn.

### A. Substantive Due Process

Although Twin City limits its due-process argument to the new-business condition, apparently conceding the validity under due-process principles of the forfeiture condition, our analysis is sufficiently broad to embrace both conditions. Our decisions have established, as have those of the United States Supreme Court, that "a state statute does not violate substantive due process if the statute reasonably relates to a legitimate legislative purpose and is not arbitrary or discriminatory. * * * [I]f a statute is supported by a conceivable rational basis, it will withstand a substantive due process attack." *Greenberg v. Kimmelman*, 99 *N.J.* 552, 563, 494 *A.*2d 294 (1985) (citations omitted). We described the proper function of the courts in this

area in *Hutton Park Gardens v. Town Council*, 68 *N.J.* 543, 350 *A.*2d 1 (1975):

> "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it." [*Id.* at 562, 350 *A.*2d 1 (quoting *Nebbia v. New York*, 291 *U.S.* 502, 537, 54 *S.Ct.* 505, 516, 78 *L.Ed.* 940, 957 (1934)).]

*Accord Duke Power Co. v. Carolina Envtl. Study Group*, 438 *U.S.* 59, 82–84, 98 *S.Ct.* 2620, 2635–36, 57 *L.Ed.*2d 595, 617–18 (1978); *Usery v. Turner Elkhorn Mining Co.*, 428 *U.S.* 1, 15, 96 *S.Ct.* 2882, 2892, 49 *L.Ed.*2d 752, 766 (1976); *Ferguson v. Skrupa*, 372 *U.S.* 726, 730–32, 83 *S.Ct.* 1028, 1031–32, 10 *L.Ed.*2d 93, 97–98 (1963); *Williamson v. Lee Optical*, 348 *U.S.* 483, 488, 75 *S.Ct.* 461, 464, 99 *L.Ed.* 563, 572 (1955).

In assessing the constitutionality of Section 72 of the Reform Act and of the conditions imposed by the Commissioner pursuant to its authorization, we observe at the outset that insurance is "a business to which the government has long had a 'special relation.'" *California State Auto. Ass'n v. Maloney*, 341 *U.S.* 105, 109, 71 *S.Ct.* 601, 603, 95 *L.Ed.* 788, 792 (1951). The principle that "the insurance business is strongly affected with a public interest and therefore properly subject to comprehensive regulation in protecting the public welfare" is long settled and well-established. *Sheeran v. Nationwide Mut. Ins. Co.*, 80 *N.J.* 548, 559, 404 *A.*2d 625 (1979).

In the context of the broad and comprehensive regulatory authority of the state over the business of insurance and the tolerant standard by which due-process challenges to such regulation must be addressed, we find no merit in Twin City's contention that the new-business condition violates its due-process rights. Viewed against the backdrop of New Jersey's chronic difficulties in assuring coverage for substandard private-passenger automobile insureds, the justification for imposing that condition on Twin City's right to withdraw is not merely rational, it is compelling. To the extent Twin City's

contention addresses the obligation to renew existing policies during its five-year withdrawal process, that obligation is hardly an onerous one. As it withdraws over a five-year period, Twin City must either place its existing policies with other carriers or renew them in order that its insureds not be disadvantaged by its withdrawal. We sustained an analogous requirement in *Sheeran, supra,* 80 *N.J.* at 561, 404 *A.*2d 625, and entertain no doubt about its reasonableness or its validity.

■ We are also convinced that due process is not offended by the Commissioner's requiring Twin City to comply, during its withdrawal period, with the Reform Act's mandate that the shift of insureds from the residual to the voluntary market be shared equitably by all insurers. As long ago as 1951 the United States Supreme Court upheld against a due-process challenge a California statute authorizing that state's insurance commissioner to approve "a reasonable plan for the equitable apportionment" among insurers of substandard risk drivers. *California State Auto. Ass'n, supra,* 341 *U.S.* at 107, 110–11, 71 *S.Ct.* at 602, 604, 95 *L.Ed.* at 791, 793. New Jersey's extraordinary difficulties with assigned-risk drivers, resulting in the JUA's staggering deficit, provoked the Reform Act's mandatory residual-market depopulation provisions. *State Farm, supra,* 124 *N.J.* at 41–42, 590 *A.*2d 191. Because the Act requires all insurers to participate equitably in the shift from the residual to the voluntary market, see *N.J.S.A.* 17:30E–14, the Commissioner's imposition of that statutory obligation as a condition of Twin City's withdrawal is not only rational and fair but virtually required by the Act. That an insurer who enjoyed profitable operations during the pre-Reform Act period could abandon entirely the remedial burdens imposed by the Act on all private-passenger insurers would be inequitable. Twin City's obligation to participate in depopulation of the residual market is limited to five years or such shorter period within which it places its policies with other carriers. The new-business condition does not violate due process.

■ We are equally convinced that, although not asserted as a due-process violation, the forfeiture condition does not violate the due-process, rights of Twin City and its affiliates in ITT Hartford. In its challenge to the forfeiture condition as an unconstitutional taking of property without just compensation, see *infra* at 412–419, 609 *A*.2d at 1260–1264, Twin City protests that the Commissioner had no regulatory basis for ignoring the separate corporate status of its affiliates by requiring the termination of their New Jersey business as a condition of Twin City's withdrawal. Although the United States Supreme Court has acknowledged that the "rationality" standard determinative of substantive-due-process challenges to State regulation is less stringent than the "takings" standard, which requires that the taking "substantially advance" the State interest to be achieved, *Nollan v. California Coastal Comm'n*, 483 *U.S.* 825, 834 n. 3, 107 *S.Ct.* 3141, 3148 n. 3, 97 *L.Ed.*2d 677, 688 n. 3 (1987), both tests focus on the strength of the connection between the government's objective and its regulatory action. By either standard, Twin City's interrelationship with its affiliates is indisputably sufficient to justify a regulatory approach that treats them pragmatically as a single entity.

Twin City's own Plan of Withdrawal establishes that ITT Hartford owns and controls Hartford Fire and, in turn, owns and controls Twin City and its other affiliates. The companies market their products under common names, use the same insurance agents designated for them by ITT Hartford, process their claims collectively through employees of Hartford Fire, and participate in reinsurance-pooling agreements with other ITT Hartford companies. At oral argument, counsel acknowledged that ultimately the decision whether Twin City and the affiliates would remain or withdraw from New Jersey would be made by ITT Hartford's management. Whether Twin City and its affiliates operate as divisions of a single corporation or as subsidiary corporations of an integrated insurance holding company, a responsible regulator could hardly ignore their common ownership and operational interdependence.

Although the Reform Act unquestionably renders more burdensome and less profitable the private-passenger automobile-insurance business in New Jersey, our decision in *State Farm* determined that the Act contemplates that insurers will earn a fair return, and it thus cannot facially be construed to deny insurers a fair rate of return. 124 *N.J.* at 62, 590 *A.*2d 191. Twin City's decision to withdraw apparently reflects the unwillingness of ITT Hartford to subject Twin City to what may be a difficult and burdensome regulatory process. The option of Twin City's withdrawal, however, would be unavailable to ITT Hartford if the affiliates were divisions under common ownership rather than subsidiaries under common control.

As the Commissioner's order observed, the withdrawal of any private-passenger insurers in the current difficult regulatory climate increases the burdens on those insurers who remain, burdens attributable to the more favorable regulatory conditions enjoyed by Twin City before the passage of the Reform Act. Other private-passenger insurers have also sought withdrawal, following Twin City's example. In such a period of regulatory turmoil and uncertainty, nothing short of severe regulatory measures imposed on private-passenger insurers threatening to withdraw—in other words, strong medicine—would be effective. If the forfeiture condition discourages withdrawal, a substantial State interest—retention of private-passenger insurers—will have been advanced. If it fails to discourage Twin City's withdrawal, the availability for acquisition of its affiliates' insurance business may operate as an inducement to other multi-line carriers to remain in New Jersey, thereby advancing an analogous and equally substantial State interest.

Twin City's reluctance to assert a substantive due-process challenge to the forfeiture condition rather persuasively demonstrates the strength of the regulatory interest advanced by that condition. We hold that that regulatory interest is more than adequate to sustain the forfeiture condition against a substantive-due-process challenge. That the forfeiture condition also

" 'substantially advance[s]' the 'legitimate state interest' sought to be achieved," *Nollan, supra,* 483 *U.S.* at 834 n. 3, 107 *S.Ct.* at 3147 n. 3, 97 *L.Ed.*2d at 688 n. 3 (quoting *Agins v. Tiburon,* 447 *U.S.* 255, 260, 100 *S.Ct.* 2138, 2141, 65 *L.Ed.*2d 106, 112 (1980))—the *Nollan* Court's governmental-interest test for takings—is also self-evident from our analysis. See *infra* at 419, 609 *A.*2d at 1264.

B.  Equal Protection

Twin City argues first that Section 72 of the Reform Act and the Commissioner's application of the license forfeiture condition denies it equal protection of law because "[i]nsurers that are not licensed to write private passenger auto insurance and are not affiliates of companies authorized to write such insurance do not have to write private passenger auto insurance as a condition of retaining their licenses" Furthermore, Twin City charges that it is the victim of irrational disparate treatment by the Commissioner.  It claims that Crum and Forster Insurance Co. was permitted to withdraw from the private-passenger automobile-insurance market by transferring its business to another insurer without its affiliates forfeiting their licenses. It also claims that two subsidiaries of the CIGNA holding company system were permitted to withdraw without any forfeiture of the licenses of other CIGNA affiliates.

■■  The Appellate Division rejected Twin City's first contention, holding that the distinction between companies already in the private-passenger automobile-insurance market and those that did not provide such insurance was "obviously related to a legitimate state interest." 248 *N.J.Super.* at 639, 591 *A.*2d 1005 (citing *New Orleans v. Dukes,* 427 *U.S.* 297, 303, 96 *S.Ct.* 2513, 2516, 49 *L.Ed.*2d 511, 516–17 (1976) (upholding ordinance prohibiting vendors selling foodstuffs from pushcarts in the French Quarter, but exempting vendors selling in French Quarter for eight years or more)).  We are fully in accord with the Appellate Division's determination.  The test for the distinction challenged by Twin City is whether the classification is rational-

ly related to some legitimate government purpose. *Western & S. Life Ins. Co. v. State Bd. of Equalization*, 451 *U.S.* 648, 668, 101 *S.Ct.* 2070, 2083, 68 *L.Ed.*2d 514, 530–31 (1981); *Greenberg, supra,* 99 *N.J.* at 567, 494 *A.*2d 294 (if right not fundamental, the government regulation will receive more-relaxed standard of judicial review); *Joseph H. Reinfeld, Inc. v. Schieffelin & Co.*, 94 *N.J.* 400, 411, 466 *A.*2d 563 (1983). Although a different regulatory choice could have been made, to place the burden of depopulating the residual market on insurers currently writing private-passenger automobile insurance surely is a regulatory determination sufficiently reasonable to withstand an equal-protection challenge.

■ Nor is there an equal-protection violation established by the Commissioner's determination not to impose Section 72 conditions on Crum & Forster and CIGNA, whose withdrawals from the New Jersey private-passenger automobile market were part of a nationwide withdrawal from that market. The Commissioner rationally could conclude that an insurer withdrawing nationally from the private-passenger automobile market was not motivated by an intention to avoid the burdens of the depopulation and other provisions of the Reform Act and therefore should not be subjected to the conditions imposed on Twin City. Because we are satisfied that plausible reasons support the distinction in the regulatory treatment accorded to Crum & Forster and CIGNA, we have no doubt that the imposition of the forfeiture and new-business conditions on Twin City does not deny it equal protection of the laws. See *U.S. Const.* amend. XIV, § 1.

C. Commerce Clause

■ In response to the contention that Section 72 of the Reform Act violates the Commerce Clause, the Appellate Division stated:

> We also reject the various arguments advanced by *amicus* that Section 72 violates the commerce clause. By enactment of the McCarran–Ferguson Act, 15 *U.S.C.S.* § 1011 *et seq.*, Congress has expressly left to the states the

regulation of the insurance business. Its purpose is to "give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Ins. Co. v. Benjamin*, 328 *U.S.* 408, 429, 66 *S.Ct.* 1142, 1155, 90 *L.Ed.* 1342, 1360 (1946). [248 *N.J.Super.* at 639–40, 591 *A.*2d 1005.]

We are in accord with the Appellate Division's disposition of the Commerce Clause issue.

### D. The Takings Issue

Twin City's principal contention before us is that the forfeiture condition, requiring its affiliates to forfeit their licenses and transfer their New Jersey insurance business to competitors, constitutes an unconstitutional "taking" of its property for public use without just compensation. *U.S. Const.* amend. V; *N.J. Const.* art. I, ¶ 20. It argues that the Appellate Division, in addressing the "takings" issue, improperly focused on the losses Twin City would incur if it remained in New Jersey rather than on its affiliates' forced surrender of approximately $120 million in aggregate annual-premium income in the event Twin City elects to surrender its license.

As the United States Supreme Court has recently observed, "takings" cases can generally be divided into two distinct categories: cases in which the government takes title to or physically occupies property, generally requiring that compensation be paid; and cases in which the government regulates the permitted uses of property, which require fact-specific determinations on whether compensation is mandated. *Yee v. City of Escondido*, 503 *U.S.* ——, ——, 112 *S.Ct.* 1522, 1525, 118 *L.Ed.*2d 153, 162 (1992). "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government * * * than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Transp. Co. v. New York City*, 438 *U.S.* 104, 124, 98 *S.Ct.* 2646, 2659, 57 *L.Ed.*2d 631, 648 (1978). Concerning the second class of cases, the Court observed:

But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the

extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. See, e.g., *Penn Central Transp. Co. v. New York City,* 438 US 104, 123–125, 57 L Ed 2d 631, 98 S Ct 2646 [2659–2660] (1978). The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions. [*City of Escondido, supra,* 503 *U.S.* at ——, 112 *S.Ct.* at 1526, 118 *L.Ed.*2d at 162.]

As a general proposition, the Supreme Court has recognized that the "Fifth Amendment's guarantee * * * [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 *U.S.* 40, 49, 80 *S.Ct.* 1563, 1569, 4 *L.Ed.*2d 1554, 1561 (1960). Nevertheless, the Court consistently has refrained from proposing or adopting rigid or precise principles for determining when a compensable taking has occurred, favoring instead a "highly nonformal, open ended, multi-factor balancing method." Frank Michelman, *Takings,* 1987, 88 *Colum.L.Rev.* 1600, 1621 (1988). As Justice Brennan acknowledged in *Penn Central, supra,* 438 *U.S.* 104, 98 *S.Ct.* 2646, 57 *L.Ed.*2d 631, the Court has simply

been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. See *Goldblatt v. Hempstead,* 369 US 590, 594, 8 L Ed 2d 130, 82 S Ct 987 [990] (1962). Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely "upon the particular circumstances [in that] case." [*Id.,* at 124, 98 *S.Ct.* at 2659, 57 *L.Ed.*2d at 648 (quoting *United States v. Central Eureka Mining Co.,* 357 *U.S.* 155, 168, 78 *S.Ct.* 1097, 1104, 2 *L.Ed.*2d 1228, 1236 (1958)).]

Nevertheless, as a guide to the *ad hoc* inquiry implicated by regulatory "takings" claims, the Court has identified three factors as having particular significance: the character of the governmental action, the economic impact of the regulation, and whether the regulation interfered with reasonable investment-backed expectations. *See Kaiser Aetna v. United States,* 444 *U.S.* 164, 175, 100 *S.Ct.* 383, 390, 62 *L.Ed.*2d 332, 343 (1979); *accord Connolly v. Pension Benefit Guar. Corp.,* 475 *U.S.* 211, 224–25, 106 *S.Ct.* 1018, 1025–26, 89 *L.Ed.*2d 166, 178–79

(1986); *Penn Central, supra,* 438 *U.S.* at 124, 98 *S.Ct.* at 2659, 57 *L.Ed.*2d at 648.

Before evaluating those critical factors in the context of the forfeiture condition, we observe preliminarily that Twin City's "takings" claim is somewhat incongruent with the Supreme Court's application of its regulatory "takings" doctrine. That application heretofore has been concentrated almost exclusively on governmental regulations restricting use of tangible property, usually some form of real estate, as opposed to regulations that interfere with or diminish only the profits of a business enterprise. See, *e.g., Lucas v. South Carolina Coastal Council,* — *U.S.* —, 112 *S.Ct.* 2886, 120 *L.Ed.*2d 798 (1992) (holding that State regulation barring all construction on barrier island residential lots constitutes taking requiring compensation unless common-law principles would have prohibited all habitable or productive improvements on lots); *City of Escondido, supra,* 503 *U.S.* —, 112 *S.Ct.* 1522, 118 *L.Ed.*2d 153 (holding that mobile-home rent-control ordinance was not physical "taking" under Fifth Amendment when viewed in context of California statute restricting termination of mobile-home park tenancy); *Nollan, supra,* 483 *U.S.* 825, 107 *S.Ct.* 3141, 97 *L.Ed.*2d 677 (holding that condition of permit to construct residence requiring grant of public easement across beach-front section of private property constituted taking of property without just compensation); *First Lutheran Church v. Los Angeles County,* 482 *U.S.* 304, 107 *S.Ct.* 2378, 96 *L.Ed.*2d 250 (1987) (holding that regulation completely depriving owner of property use entitles owner to compensation for period prior to determination that regulation was compensable "taking" under Fifth Amendment); *Hodel v. Irving,* 481 *U.S.* 704, 107 *S.Ct.* 2076, 95 *L.Ed.*2d 668 (1987) (holding that federal statute barring inheritance of highly-fractioned Indian-land allotments and providing for escheat to tribe constituted taking of decedent's property without just compensation); *Keystone Coal v. DeBenedictis,* 480 *U.S.* 470, 107 *S.Ct.* 1232, 94 *L.Ed.*2d 472 (1987) (holding that Pennsylvania statute restricting mining operations to prevent

subsidence damage did not constitute "taking" of property under Fifth Amendment); *Agins v. Tiburon*, 447 *U.S.* 255, 100 *S.Ct.* 2138, 65 *L.Ed.*2d 106 (1980) (holding that municipal zoning ordinances rezoning private residential property and allowing one to five single-family residences on five-acre tract did not constitute taking without just compensation); *Kaiser, supra*, 444 *U.S.* 164, 100 *S.Ct.* 383, 62 *L.Ed.*2d 332 (holding that government's requirement of public access to marina joined to bay due to private development of inland lagoon constituted exercise of eminent-domain power, requiring payment of compensation); *Penn Central, supra*, 438 *U.S.* 104, 98 *S.Ct.* 2646, 57 *L.Ed.*2d 631 (holding that application of New York City's Landmark Preservation Law, preventing use of air space above Grand Central terminal, did not constitute taking of private property without just compensation).

In a handful of cases involving regulatory "takings" of commercial property interests other than land, the Court generally has been reluctant to conclude that compensation was required. See *Connolly, supra*, 475 *U.S.* 211, 106 *S.Ct.* 1018, 89 *L.Ed.*2d 166 (holding that provisions of federal law requiring that employer withdrawing from multi-employer pension plan pay proportionate share of plan's unfunded vested benefits in contravention of plan's contribution requirements did not constitute compensable taking; Court noted that government had taken nothing for its own use but had merely nullified contractual limitation by imposing additional obligations, consistent with congressional power, on withdrawing employers); *Ruckelshaus v. Monsanto Co.*, 467 *U.S.* 986, 104 *S.Ct.* 2862, 81 *L.Ed.*2d 815 (1984) (holding that EPA's disclosure of post–1978 pesticide data did not constitute taking of property, although pesticide producer had property interest protected by takings clause of Fifth Amendment in health, safety, and environmental data submitted to federal government); *Andrus, supra*, 444 *U.S.* 51, 100 *S.Ct.* 318, 62 *L.Ed.*2d 210 (holding that ban on sale of avian Indian relics existing before species of birds whose parts were used in relics became protected by federal law did

not constitute compensable taking, noting that owners retained right to possess, transport, donate, and devise affected property); *Miller v. Schoene,* 276 *U.S.* 272, 48 *S.Ct.* 246, 72 *L.Ed.* 568 (1928) (holding that Virginia statute requiring owner of ornamental cedar trees to destroy trees to avoid infecting adjacent apple orchards with cedar rust did not constitute compensable taking of property); *Hadacheck v. Sebastian,* 239 *U.S.* 394, 36 *S.Ct.* 143, 60 *L.Ed.* 348 (1915) (holding that municipal ordinance prohibiting brickmaking within designated area did not constitute compensable taking of property containing valuable clay deposits that could not feasibly be relocated to alternative site for brickmaking purposes); *Mugler v. Kansas,* 123 *U.S.* 623, 8 *S.Ct.* 273, 31 *L.Ed.* 205 (1887) (holding that Kansas statute prohibiting manufacture and sale of intoxicating liquors did not constitute compensable taking of claimant's brewery erected before statute was enacted); *see also* Joseph L. Sax, *Takings and the Police Power,* 74 *Yale L.J.* 36, 63 (1964) (proposing that economic losses imposed by government acting in its arbitral or regulatory capacity be treated as non-compensable exercise of police power); William M. Treanor, Note, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment,* 94 *Yale L.J.* 694, 708 (1985) (observing that intent of drafters of "takings" clause was to limit application to physical takings).

Against that context of decisional law, we consider the specific factors generally emphasized in regulatory "takings" cases. We emphasize that application of those factors necessarily involves a balancing of the private interests affected by the regulation against the public interests that are advanced. *See Agins, supra,* 447 *U.S.* at 260–61, 100 *S.Ct.* at 2141–42, 65 *L.Ed.*2d at 112. We have already elaborated on the character of the governmental action, *supra* at 407–410, 609 *A.*2d at 1258–1259, noting that the forfeiture condition was a forceful but relevant regulatory measure imposed to advance the substantial State interest in discouraging Twin City's withdrawal from the private-passenger automobile market, as well

as the State's interest in encouraging other multi-line carriers to continue in that market. The regulatory crisis in New Jersey's private-passenger automobile-insurance market supports and enhances the reasonableness of and necessity for strong regulatory measures to promote market stability while the planned depopulation of the residual market is implemented.

The second factor, the economic impact of the regulation, emphasizes the potential significance of the financial loss that the Twin City affiliates may sustain if Twin City ceases to operate in New Jersey. We note preliminarily that because the property affected by the regulation is the value of the Twin City affiliates' New Jersey insurance business, we have no occasion to consider application of those decisions involving *real* property that categorically find a compensable taking when a regulation "denies all economically beneficial or productive use of land." *See, e.g., Lucas, supra,* —— *U.S.* at ——, 112 *S. Ct.* at 2893. The record indicates that the affiliates' businesses generate aggregate annual premiums of $120 million and that those businesses are generally profitable, although no estimate of lost profits has been presented. The record does not indicate whether the affiliates could sell or otherwise receive compensation from other insurers interested in succeeding to lines of business written by one or more of Twin City's affiliates. We take for granted, however, that the surrender by Twin City's affiliates of their respective licenses would not necessarily result in the elimination of all commercial value inherent in the affiliates' New Jersey business operations, some aspects of which undoubtedly could be applied to business in other states. Nevertheless, we cannot speculate on whether, conceding the significant economic loss that the affiliates would sustain if forced to surrender their New Jersey markets, ITT Hartford would be able to recoup that loss by expanding its marketing efforts in other states with a less-restrictive regulatory climate. At least one commentator has noted that competition among state governments tends to prevent overregulation, offering companies choices in determining those States' regula-

tory systems to which it will subject its business operations. See Vicki Bean, *"Exit" as a Constraint on Land Use Exactions: Rethinking the Unconstitutional Conditions Doctrine,* 91 *Colum.L.Rev.* 473, 508–09 (1991).

The third factor, whether the regulation interfered with reasonable investment-backed expectations, lends itself to either side of the argument. On the one hand, Twin City would undoubtedly acknowledge the strong, well-recognized governmental interest in regulating the business of insurance. See *Sheeran, supra,* 80 *N.J.* at 559, 404 *A.*2d 625. Moreover, the Appellate Division observed that Twin City and its investors

had fair warning that the Legislature would link appellants' licenses to write other lines of insurance with their continuing to write private passenger automobile policies. In his 1987 veto message of Senate Committee Substitute for Senate Bill No. 2318 and Assembly Bill No. 2404, Governor Kean specifically called for legislation similar to Section 72:

We need to say to insurance companies that before they quit doing business in New Jersey in one line of insurance, they must be able to show that they are doing so for a good reason. If not, the Insurance Commissioner must have the power to require the company's licenses for all lines.

\* \* \* \* \* \* \* \*

The language that I am recommending to be added includes reasonable limits on the authority of the Insurance Commissioner to require the surrender of other licenses in the holding company system of the company wishing to withdraw from our State. [248 *N.J.Super.* at 628–29, 591 *A.*2d 1005.]

On the other hand, no such "linkage" had previously been imposed on affiliated companies writing insurance in different New Jersey markets, and to that extent the implementation of the forfeiture condition may not have been anticipated by Twin City.

On balance, we are fully satisfied, considering the specific factors ordinarily emphasized in regulatory "takings" analysis in the context of existing and developing "takings" jurisprudence, and weighing the compelling public interest against the private interests adversely affected, that no compensable taking of property under either the Federal or State Constitutions is implicated by the forfeiture condition. We consider that condition to be more in the nature of a regulatory limitation on

Twin City's right to abandon its responsibilities in the private-passenger automobile market than a "taking" of its affiliates' property for public use. As in *Connolly, supra,* 475 *U.S.* at 224, 106 *S.Ct.* at 1025, 89 *L.Ed.*2d at 178, the State has taken none of the affiliates' businesses for its own use; rather, it has terminated the affiliates' authority to do business as a condition of Twin City's withdrawal. That Twin City's affiliates will lose profits because of the restriction imposed by the Commissioner does not give rise to a compensable taking of property, in view of our conclusion that the underlying regulation is valid. *Supra* at 407–410, 609 *A.*2d at 1258–1259. Moreover, we have already determined that the objective of the forfeiture condition is sufficiently related to the State's regulatory power to supervise Twin City's withdrawal from the market as to satisfy the enhanced standard set forth in *Nollan, supra,* 483 *U.S.* at 834 n. 3, 107 *S.Ct.* at 3147 n. 3, 97 *L.Ed.*2d at 688 n. 3, that the "taking" substantially advance the State interest to be achieved. *Supra* at 409, 609 *A.*2d at 1259. We also have carefully considered the public interest served by the forfeiture condition in the context of the economic impact of that condition on Twin City's affiliates and the extent to which it interferes with their investment-back expectations. Although the economic impact is potentially quite severe, we are thoroughly persuaded that the public interest advanced by the regulation substantially outweighs its adverse effect on ITT Hartford. Accordingly, we find no merit in Twin City's contention that the forfeiture condition imposes a compensable taking of its affiliates' property.

▮▮▮▮ Finally, we address and reject the contention of *amicus,* American Insurance Association, that Section 72 of the Act and the forfeiture condition imposed by the Commissioner's order violate the so-called "unconstitutional conditions" doctrine, relying on *Nollan, supra,* 483 *U.S.* 825, 107 *S.Ct.* 3141, 97 *L.Ed.*2d 677. That doctrine holds generally "that government may not grant a benefit on the condition that the beneficiary surrender a constitutional right, even if the government may withhold that benefit altogether." Kathleen M. Sullivan, *Un-*

*constitutional Conditions*, 102 *Harv.L.Rev.* 1413, 1415 (1989). Prior to *Nollan*, the unconstitutional conditions doctrine was not generally identified with "takings" jurisprudence. *See* Richard A. Epstein, *Takings: Descent and Resurrection*, 1987 *Sup.Ct.Rev.* 1, 34–35 ("[*Nollan*] thus introduces, perhaps for a first time, the vexed doctrine of unconstitutional conditions into the law of eminent domain.").

■ However, the unconstitutional-conditions doctrine does not necessarily preclude the imposition of conditions on "the exercise of a constitutional right." *Id.* at 35; *see, e.g., Lyng v. International Union*, 485 *U.S.* 360, 108 *S.Ct.* 1184, 99 *L.Ed.*2d 380 (1988) (holding that Federal statute providing that household otherwise eligible for food stamps cannot become participant in program or receive increased allotment if member of household is on strike because of labor dispute not an unconstitutional restriction of striker's rights under First and Fifth Amendments); *Maher v. Roe*, 432 *U.S.* 464, 97 *S.Ct.* 2376, 53 *L.Ed.*2d 484 (1977) (upholding under Equal Protection Clause condition imposed by State welfare program that generally subsidized medical expenses incidental to pregnancy but limited benefits for first trimester abortions to those found "medically necessary"); *Republican Nat'l Comm. v. Federal Election Comm'n*, 487 *F.Supp.* 280 (S.D.N.Y.) (upholding provision of presidential public financing law conditioning eligibility for public financing on compliance with spending limits, notwithstanding candidates' First Amendment right to make unlimited campaign expenditures), *aff'd*, 445 *U.S.* 955, 100 *S.Ct.* 1639, 64 *L.Ed.*2d 231 (1980). Thus, the critical inquiry is "which conditions may be attached to what privileges and why." Epstein, *supra*, 1987 *Sup.Ct.Rev.* at 35.

■ We need not, however, explore the limits of the unconstitutional-conditions doctrine in view of our determination that the forfeiture condition is not otherwise unconstitutional, having heretofore concluded that that condition did not violate principles of due process, *supra* at 407–410, 609 *A.*2d at 1258–

1259, equal protection, *supra* at 411, 609 *A.*2d at 1260, or taking without just compensation, *supra* at 412–419, 609 *A.*2d at 1260–1264. Based on those determinations, we are satisfied that the unconstitutional-conditions doctrine is inapplicable to Twin City's contention that Section 72 of the Act and the forfeiture condition are invalid.

We affirm the judgment of the Appellate Division.

*For affirmance—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.*

*Opposed—*None.