CHARLES R. HOWELL, COMMISSIONER OF BANKING AND INSURANCE, STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. ROSECLIFF REALTY CO., INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued March 19, 1968—Decided July 10, 1968.

*Mr. E. Robert Levy,* Deputy Attorney General, argued the cause for appellant (*Mrs. Marilyn Loftus Schauer,* Assistant Attorney General, of counsel; *Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

*Mr. George B. Gelman* argued the cause for respondent (*Messrs. Calissi, Gelman and Cuccio,* attorneys).

The opinion of the court was delivered by

WEINTRAUB, C. J.  The Commissioner of Banking and Insurance brought this action against defendant Rosecliff to collect a tax on premiums it paid unadmitted foreign carriers for insurance coverage on New Jersey risks. The policies were written in New York. The trial court gave judgment for Rosecliff, holding that New Jersey could not reach the transactions because of *State Board of Insurance v. Todd Shipyards Corp.,* 370 *U. S.* 451, 82 *S. Ct.* 1380, 8 *L. Ed. 2d* 620 (1962). We certified the matter before argument in the Appellate Division.

The insurance industry is highly regulated to the end that insurance will be written fairly and by companies that are financially sound. When coverage cannot be obtained from fully authorized carriers at filed rates, the insurance, then called "surplus," may be placed elsewhere. The surplus lines law, *N. J. S. A.* 17:22–6.40 *et seq.,* deals with such situations. It permits the "exporting" of surplus lines to unauthorized carriers but still seeks to achieve a measure of safety for the insured and simultaneously to support the basic statutory purpose that risks be covered, where they can be, by companies that are authorized to write here and hence under maximum supervision.

*N. J. S. A.* 17:22–6.42 provides that if certain "insurance coverages of subjects resident, located or to be performed in the State" cannot be obtained from authorized insurers, such coverages, designated by the act as "surplus lines," may be procured from unauthorized insurers, subject to the conditions that (a) the insurance is "eligible for export," (b) the insurer is an "eligible surplus lines insurer," (c) the insurance is placed through a licensed New Jersey "surplus lines agent," and (d) other provisions of the statute are met.

*N. J. S. A.* 17:22–6.43 defines what coverage is "eligible for export." In general terms, to be thus eligible, the insurance must not be procurable, after diligent effort, from an authorized insurer; the premium rate at which the insurance is exported shall not be lower than the lowest rate filed by an authorized insurer; and the policy shall not provide coverage different from that in actual current use by a majority of the authorized insurers.

*N. J. S. A.* 17:22–6.45 provides that a surplus lines agent may place coverage only with an unauthorized insurer which is an "eligible surplus lines insurer." A determination of eligibility must be requested by a licensed surplus lines agent, and in support the agent or the insurer must supply specified data for the Commissioner's evaluation. The statute recognizes that, notwithstanding such filing, the Commissioner could not achieve the degree of supervision required

with respect to an authorized insurer, and hence the statute expressly says it is not the Commissioner's duty or responsibility to determine "the actual financial condition or claims practices of any unauthorized insurer; and the status of eligibility * * * shall indicate only that the insurer appears to be sound financially and to have satisfactory claims practices, and that the commissioner has no credible evidence to the contrary." The same section further provides that if insurance cannot be obtained from an eligible surplus lines insurer, the surplus lines agent may, upon filing certain papers with the Commissioner, place the insurance with an ineligible unauthorized insurer which, before accepting the risk, shall deposit specified securities with the Commissioner.

*N. J. S. A.* 17:22–6.59 imposes a tax of 3% of all gross premiums and requires the surplus lines agent to collect the tax from the insured. *N. J. S. A.* 17:22–6.64 provides that if the insured places the surplus line without the intervention of a surplus lines agent, the insured shall withhold the 3% tax and remit it to the State, in default of which the insured shall be liable for the tax. In the case before us, Rosecliff placed the surplus lines without the intervention of a surplus lines agent, and not having remitted the 3% tax, this suit was brought.

I

██ Rosecliff says the statute does not reach the transaction here involved. *N. J. S. A.* 17:22–6.64 reads:

"Any insurance in an unauthorized insurer procured through negotiations or an application, in whole or in part occurring or made within or from within this State, or for which premiums in whole or in part are remitted directly or indirectly from within this State, shall be deemed to be insurance procured, or continued or renewed in this State within the intent of paragraph 1 above."

The contracts of insurance were negotiated in New York between a representative of Rosecliff and the carriers, and the premiums were paid by Rosecliff's checks on a New York

bank account. Rosecliff says the negotiations were not "from within this State" and that the premiums were not remitted "directly or indirectly from this State." We think Rosecliff is wrong on both counts. Rosecliff is a New Jersey corporation with its principal place of business at Fort Lee in this State. It operates a large amusement park in Fort Lee and Cliffside Park. The Legislature sought in broad terms to reach all surplus line transactions relating to New Jersey risks. In that context, we think negotiations occur in part "from within this State" when a corporation formed under our laws and with its principal place of business in New Jersey designates the negotiator on its behalf. We also think it clear the alternative provision was met because the premiums were "remitted directly or indirectly from within this State." The moneys on deposit in the New York account were earned at the amusement park in New Jersey. It would be absurd to suppose a corporation of this State whose income originated here can place itself beyond the statute by putting the moneys in a New York bank account before sending them on to the carrier.

## II

We turn then to the principal question, whether the transactions were beyond the legislative power of the State because of the doctrine of *Todd Shipyards*. We think the answer turns upon the activities within the State of New Jersey, and hence we will relate in those terms the facts stipulated by the parties.

As already noted, defendant is a New Jersey corporation, with its principal place of business here. It owns and operates Palisades Amusement Park at Fort Lee and Cliffside Park. The risks covered relate to the ownership of the real and personal property comprising the amusement park and to the business operation at the park. The coverage includes public liability, fire and extended coverage, money and

securities, burglary and theft, garage keeper's liability and employee security.

The insurers, all of London, are unauthorized within the meaning of the surplus lines law. In fact, all are on the "eligibility" list, so that the insurance lines could have been placed with them by a licensed surplus lines agent, and if they had, there would have been no question about the taxability of the premiums. But the insurance was placed in New York City through a New York broker, Frank Feit and Company, who was not licensed as a surplus lines agent. As we have said, the premiums were paid by checks on a New York bank account, which checks were prepared and signed by officers of Rosecliff at its Fort Lee office and then carried to New York where they were mailed or delivered to the broker.

The contracts of insurance are not part of the record and hence we do not know precisely what the insurers are required to do by way of performance. The stipulation reads:

"When a loss is incurred by Rosecliff under one of the kinds of insurance coverage listed above, with the exception of public liability, Rosecliff notifies Frank Feit and Company at the latter's office in New York by telephone or written memorandum. A representative of Frank Feit and Company then notifies the insurer and the insurer in turn assigns an adjuster to adjust the loss. In the only major claim made by Rosecliff since 1961, destruction of the Fun House by fire, the insurer's adjuster was an independent contractor, Toplis and Hardy of New York. Frank Feit himself came to inspect the premises with an adjuster. The negotiations that followed were conducted in New York City between Frank Feit and Company and Mr. De Vito [a New York accountant retained by Rosecliff] on behalf of the insured and representatives of the adjuster on behalf of the insurer. Although the policies contain no specific provisions as to the manner in which or the place at which the losses are to be paid, the above loss and any other minor losses are and have been paid by the transmission of funds from the insurer to the account of Frank Feit and Company in the First National City Bank of the City of New York. Frank Feit and Company has then drawn its check payable to Rosecliff.

Rosecliff maintains a register at its place of business wherein are recorded the names of all persons involved in any accidents occurring at the insured's place of business. During the period when the amusement park is in operation, generally April to

September, a representative of the adjustment firm designated by the insurer, an independent contractor located in New York, visits the insured's place of business at least one or more times each week and copies the names and addresses recorded in the register since the date of his last visit. The adjuster's representative contacts the potential claimant who in some cases is a resident of the State of New Jersey. The contact which is made by the adjuster's representative may be in person at the claimant's residence or by telephone. Many of the claims are settled directly between the adjuster's representative and the claimant, and the adjuster's representative obtains a release in exchange for a cash consideration. In some instances the release is obtained from the claimant during the course of a personal visit by the representative with the claimant at the claimant's place of residence in New Jersey.

In addition to providing names of potential claimants to the adjuster in the manner described above, the insured also delivers to the adjuster copies of attorney's letters on behalf of claimants received by Rosecliff. The adjuster in some cases deals with the attorney in a manner similar to that which would normally be followed by an adjuster on behalf of any liability insurer, and where litigation ensues, the insurer undertakes the defense of the litigation through attorneys employed in the State in which such litigation is commenced, including New Jersey."

We note that the public liability policy carries by far the largest premium, the last annual premium being $99,979.89, a sum which suggests the amount of New Jersey activity thereunder, if the contract has, as we infer it does, the usual covenant to defend as well as to pay.

Prior to *United States v. South-Eastern Underwriters Ass'n*, 322 *U. S.* 533, 64 *S. Ct.* 1162, 88 *L. Ed.* 1440 (1944), insurance contracts were deemed not to be articles of commerce, and hence were not interstate transactions within the commerce clause. Accordingly the State's power to deal with the subject involved only the due process provision. When *South-Eastern Underwriters* held insurance policies were articles of commerce, the Congress promptly enacted the McCarran-Ferguson Act, 15 *U. S. C. A.* §§1011–1015, to continue the State's authority to regulate and tax those transactions. Section 1011 reads:

"Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public

interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

Section 1012 reads:

"(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: * * *"

Although the statute on its face involved no more than the commerce clause, the Court, by reason of the House Report, found a legislative intent that the statute's approval of State action be subject to the limits set by three decisions of the Court under the due process provision. That report, quoted in *Todd Shipyards, 370 U. S.,* at *pp.* 455–456, 82 *S. Ct.,* at *p.* 1383, 8 *L. Ed. 2d,* at *p.* 624, reads:

"It is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the Southeastern Underwriters Association case. Briefly, your committee is of the opinion that we should provide for the continued regulation and taxation of insurance by the States, subject always, however, to the limitations set out in the controlling decisions of the United States Supreme Court, as, for instance, in Allgeyer v. State of Louisiana, 165 U. S. 578, 17 S. Ct. 427, 41 L. Ed. 832; St. Louis Cotton Compress Co. v. State of Arkansas, 260 U. S. 346, 43 S. Ct. 125, 67 L. Ed. 297, and Connecticut General Life Ins. Co. v. Johnson, 303 U. S. 77, 58 S. Ct. 436, 82 L. Ed. 673, which hold, inter alia, that a State does not have power to tax contracts of insurance or reinsurance entered into outside its jurisdiction by individuals or corporations resident or domiciled therein covering risks within the State or to regulate such transactions in any way."

Recognizing that Congress does not have "the final say" as to due process, the Court nonetheless said that when "Congress has posited a regime of state regulation on the continuing

validity of specific prior decisions * * *, we should be loath to change them." 370 *U. S.,* at *p.* 457, 82 *S. Ct., at p.* 1384, 8 *L. Ed. 2d,* at *p.* 625. Hence, the Court concluded, the three cases cited in the House Report should remain vital notwithstanding doubts upon them theretofore expressed in *Osborn v. Ozlin,* 310 *U. S.* 53, 60 *S. Ct.* 758, 84 *L. Ed.* 1074 (1940), and *Hoopeston Canning Co. v. Cullen,* 318 *U. S.* 313, 63 *S. Ct.* 602, 87 *L. Ed.* 777 (1943).

Rosecliff reads *Todd Shipyards* to mean that a State cannot reach any contract of insurance made beyond its borders. We think *Todd Shipyards* means no more than this, that insurance transactions of the kinds involved in *Todd Shipyards* and the three cases cited in the House Report cannot be taxed or regulated if the only connection with the State is the location therein of the risk insured, but the State may deal with the insurance if activities either in the making or in the performance of the contract occur within its borders. This becomes clear from a consideration of the three cases to which the House Report referred and from *Todd Shipyards* itself.

In *Allgeyer v. State of Louisiana,* 165 *U. S.* 578, 17 *S. Ct.* 427, 41 *L. Ed.* 832 (1897), the statute imposed a fine for the issuance of a marine insurance policy by a company not authorized to do business in that State. Involved was an open policy of marine insurance which provided coverage for cotton while in transit from New Orleans to foreign ports. The policy was written in New York with a New York insurer. The premiums were paid in New York and so were the losses. The only activity in Louisiana under the policy was the sending to New York of a letter advising of each shipment, to the end that the insurer might issue a separate policy for the shipment. The Court deemed the giving of such notice to be an insignificant act. Hence the only contact with Louisiana was the presence of a commodity which, as we read the case, was not even covered until it entered the interstate or international shipment. The Court plainly limited its holding to the precise facts. It indicated that the result

would be otherwise if the contract was to be performed in Louisiana, saying (165 *U. S.* at *p.* 591, 178 *S. Ct.*, at *p.* 432, 41 *L. Ed.*, at *p.* 836) :

"* * * Yet the power does not and cannot extend to prohibiting the citizen from making contracts of the nature involved in this case outside of the limits and jurisdiction of the state, and which are also to be performed outside of such jurisdiction * * *. It was a valid contract, made outside of the state, to be performed outside of the state, although the subject was property temporarily within the state."

*St. Louis Cotton Compress Co. v. State of Arkansas,* 260 *U. S.* 346, 43 *S. Ct.* 125, 67 *L. Ed.* 297 (1922), involved a contract of fire insurance. Arkansas levied a 5% tax on premiums on insurance contracts made with unauthorized companies while imposing a 3% tax if the insurer was authorized to act. The contract there involved was made in Missouri. The Court found the case stronger than *Allgeyer* because "here no act was done within the state, whereas there a letter constituting a step in the contract was posted within the jurisdiction." 260 *U. S.*, at *p.* 349, 43 *S. Ct.*, at *p.* 125, 67 *L. Ed.*, at *p.* 299. Thus the case was decided on the premise that neither in the making nor in the performance of the contract was there any activity in Arkansas.

So in *Connecticut General Life Ins. Co. v. Johnson,* 303 *U. S.* 77, 58 *S. Ct.* 436, 82 *L. Ed.* 673 (1938), there was no activity in the taxing state either with respect to the making of the contract or its performance. Involved were contracts of reinsurance between Connecticut General and other carriers with respect to policies of life insurance those other carriers had issued in California to residents of California. Connecticut General was actually authorized to do business in California, but the reinsurance contracts concerned only the carriers, were made in Connecticut, and the premiums and losses were payable there. The Court stressed that the contracts did not contemplate performance in California, saying (303 *U. S.*, at *p.* 81, 58 *S. Ct.*, at *p.* 438, 82 *L. Ed.*, at *p.* 678) :

"* * * The reinsurance involved no transactions or relationship between appellant and those originally insured, and called for no act in California. * * * No act in the course of their formation, performance or discharge, took place there. The performance of those acts was not dependent upon any privilege or authority granted by it, and California laws afforded to them no protection."

As we have noted already, the continuing vitality of these cases had been questioned prior to _Todd Shipyards_. The reason is evident. Insurance is so essential a part of the area of a State's primary responsibility that the State's power should not depend upon where the parties choose to contract for the insurance or to pay the loss. The State's interest and its responsibility to its citizens should be enough to support regulation and taxation of policies relating to the risks within its jurisdiction. Moreover, the foreign carrier, no less than the admitted company, is aided by the measures the State takes to limit the incidence of the losses covered by insurance. Hence there should be no need to find additional contacts or activities within a State to enable the State to act. This in essence was the reason that the viability of _Allgeyer_ and its progeny was doubted in _Osborn, supra,_ and _Hoopeston Canning, supra._

_Todd Shipyards_ did no more than place the precise holdings of those cases beyond reconsideration; it did not expand their reach. On the contrary, _Todd Shipyards_ again stressed as to the insurance contracts there before the Court that neither the making of the contracts nor their performance involved any activity in the taxing State. The opinion reads (370 _U. S.,_ at _pp._ 454–455, 82 _S. Ct.,_ at _p._ 1383, 8 _L. Ed. 2d,_ at _pp._ 623–624) :

"The insurance transactions involved in the present litigation take place entirely outside Texas. The insurance, which is principally insurance against loss or liability arising from damage to property, is negotiated and paid for outside Texas. The policies are issued outside Texas. All losses arising under the policies are adjusted and paid outside Texas. The insurers are not licensed to do business in Texas, have no office or place of business in Texas, do not

solicit business in Texas, have no agents in Texas, and do not investigate risks or claims in Texas.

The insured is not a domiciliary of Texas but a New York corporation doing business in Texas. Losses under the policies are payable not to Texas residents but to the insured at its principal office in New York City. The only connection between Texas and the insurance transactions is the fact that the property covered by the insurance is physically located in Texas."

Thus the plain inference from *Todd Shipyards* is that if there were activity within a State either in the making or in the performance of the contract, the State could exercise its governmental powers to further its undoubted interests in insurable risks within its borders. That view of *Todd Shipyards* was taken in two well-reasoned cases upholding the right of a State to regulate the selling of insurance by out-of-state mail. *Ministers Life and Casualty Union v. Haase*, 30 *Wis.* 2d 339, 141 *N. W.* 2d 287 *(Sup. Ct.* 1966), appeal dismissed for want of a substantial federal question, 385 *U. S.* 205, 87 *S. Ct.* 407, 17 *L. Ed.* 2d 301 (1966); *People v. United National Life Ins. Co.*, 66 *Cal.* 2d 577, 58 *Cal. Rptr.* 599, 427 *P.* 2d 199 *(Sup. Ct.* 1967), appeal dismissed for want of a substantial federal question, 389 *U. S.* 330, 88 *S. Ct.* 506, 19 *L. Ed.* 2d 562 (1967). *Cf. Travelers Health Ass'n v. Commonwealth of Virginia*, 339 *U. S.* 643, 70 *S. Ct.* 927, 94 *L. Ed.* 1154 (1950).

We turn then to the insurance here involved. As we have said, the most substantial policy in terms of premium cost is the public liability policy. Neither *Todd Shipyards*, nor the cases preserved by it, remotely relate to such a policy.[1] Such contracts call for performance by the insurer

---

[1] The State court opinion in *Todd Shipyards* describes the coverages involved. State Board of Insurance v. Todd Shipyards Corp., 340 *S. W.* 2d 339, 340 *(Tex. Civ. App.* 1960). From their description, we gather they protected the insured as to property damage with respect to the insured's own property or property entrusted to it. As to products liability insurance, the coverage is described as "excess," from which we infer that the insured alone was obligated to investigate, settle and defend, with the carrier obligated only to pay to the insured for losses sustained above specified limits.

within the State in which the covered risks exist. The insurers are obliged to investigate, to settle, to defend, and to pay. The stipulation of facts quoted above reveals intensive activity in that regard. In thus earning the premiums the insurers receive the State's protection and enjoy its facilities and services. It is no answer to say, as Rosecliff does, that the insurers engage "independent contractors" to perform their contracts for them; the fact remains that the obligation is the insurers' to perform, and it is irrelevant to the subject of taxation whether they perform through employees or through individuals who, as to the insurers, have the status of contractors.[2]

Liability policies are matters of obvious State concern, not only with respect to the security of the insured but also with respect to the compensation of the injured claimants. To that end liability insurance is closely regulated, and as to some risks compulsory insurance is common. If liability policies are beyond the State's power to regulate and to tax merely because they are made outside the State, the State's ability to protect the public in this important area could be seriously limited. The State's authority to act seems evident. There is not even a hint the other way in *Todd Shipyards*.

As to the other policies issued to Rosecliff, the record is virtually barren with respect to the subject of performance. The stipulation reveals merely that "In the only major claim made by Rosecliff since 1961, destruction of the Fun House by fire, the insurer's adjuster was an independent

---

[2] Rosecliff submitted to us a deposition of a witness in *Todd Shipyards* from which it contends that the insurer in *Todd* actually surveyed the losses in Texas and did so through an independent contractor, from which Rosecliff contends the use of an independent contractor insulates a carrier from taxation of its premiums. The answer is that the Supreme Court did not so view the record. In any event it appears that the association to which Rosecliff refers was in fact the agent of the *insured*, and prepared for the *insured* and at the *insured's* expense the estimates of loss which were sent to the insurer in New York. The insurer was not bound by that association's estimates.

contractor, Toplis and Hardy of New York. Frank Feit [the insured's broker] himself came to inspect the premises with an adjuster." Thus here, unlike *Allgeyer, St. Louis Cotton, Connecticut General,* and *Todd Shipyards,* it appears that an adjuster came to New Jersey in the performance of the contract. More importantly, there is not even proof that the parties affirmatively agreed that the contracts would be performed only outside of New Jersey. Ordinarily insurers on such risks do visit the scene after a loss and frequently before, and we see no reason to assume the parties bargained for a different procedure. We know from the stipulation that with respect to the loss described as "the only major claim," the insurer's adjuster did come to New Jersey. Such acts within the State would themselves be enough to support the tax. See *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue,* 275 *U. S.* 87, 98, 48 *S. Ct.* 100, 72 *L. Ed.* 177, 182–183 (1927). To the foregoing it may be added, especially in the light of the excerpt from *Todd Shipyards* quoted above, that Rosecliff is a New Jersey corporation, earns in this State the money with which it pays the premiums, draws its premium checks here, and that realistically the policies are an integral part of the total business operation conducted in this State alone.

## III

Finally Rosecliff charges the statute accomplishes an illegal discrimination. As we read the pretrial order, the initial complaint was that the statute imposed a tax if the carrier is an unauthorized carrier and no tax if the carrier is duly admitted. In fact, this is not so. When an admitted carrier writes insurance coverage declared eligible for export, the carrier pays a tax on premiums, at the rate of 2%, the rate applicable to non-surplus insurance. *N. J. S. A.* 17:22–6.44. In its brief, Rosecliff complains that since the rate is 3% in the case of an unauthorized carrier and 2% in the

case of a duly admitted company, there is an unreasonable and discriminatory burden on interstate commerce.

In *Prudential Ins. Co. v. Benjamin,* 328 *U. S.* 408, 431, 66 *S. Ct.* 1142, 90 *L. Ed.* 1342, 1361 (1946), the Court held that the McCarran-Ferguson Act approved of State legislation which imposed a tax on premiums, received by foreign insurers, as a condition for doing business in the State, the Court saying the Congress determined "that state taxes, which in its silence might be held invalid as discriminatory, do not place on interstate insurance business a burden which it is unable generally to bear or should not bear in the competition with local business."

■ Rosecliff made no effort to demonstrate the tax differential is more than a foreign carrier can bear competitively. In fact, the discrimination is not between the domestic and the foreign insurer, since any foreign insurer would be taxed at the lower rate if duly admitted to do business in the State. Rather the higher rate runs against only those foreign insurers who do not seek admittance. The classification is reasonable. The legislative objective is to encourage the placement of insurance with carriers which are admitted and therefore under greater supervision. The public interest is thereby advanced. *New Jersey Restaurant Association, Inc. v. Holderman,* 24 *N. J.* 295, 301 (1957). Moreover, it is not unlikely that an admitted company incurs expenses in complying with our regulatory measures which expenses readily offset the differential in the tax rate. We note, too, that in his conditional approval of the 1964 bill which amended *N. J. S. A.* 17:22–6.44, the Governor commented upon that differential and explained it in terms of administrative problems. There may be still other considerations. The stipulation of facts was not addressed to the discrimination issue. In any event, we think it clear that Rosecliff has not sustained its burden to prove a violation of any relevant constitutional provision.

The judgment is reversed and the matter remanded to the trial court with directions to enter judgment for plaintiff.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.