724 A.2d 848

IN RE THE OBJECTION OF THE MARKEL INSURANCE COMPANIES (EVANSTON INSURANCE COMPANY, ESSEX INSURANCE COMPANY, LINCOLN INSURANCE COMPANY, AND CARLISLE INSURANCE COMPANY IN ITS OWN RIGHT AND AS SUCCESSOR IN INTEREST TO INVESTORS SPECIAL RISK INSURANCE COMPANY) TO THE SPECIAL PURPOSE APPORTIONMENTS FOR FY 96 AND FY 97 PURSUANT TO *N.J.S.A.* 17:1C–19 *ET SEQ.*, AND DEPARTMENT OF BANKING AND

---

[7] *State v. CIBA–GEIGY, supra*, 247 *N.J.Super.* at 316, 589 *A.*2d 180, also noted "the general proposition under existing New Jersey law that evidence obtained in violation of a disciplinary rule need not be suppressed."

INSURANCE ORDER NOS. A–97–150 AND A–97–152.[1]IN RE THE OBJECTION OF LEXINGTON INSURANCE COMPANY TO THE SPECIAL PURPOSE APPORTIONMENTS FOR FY 96 AND FY 97 PURSUANT TO *N.J.S.A.* 17:1C–19 *ET SEQ.*, AND DEPARTMENT OF BANKING AND INSURANCE ORDER NO. A–97–162.[1] IN RE THE OBJECTION OF THE LANDMARK INSURANCE COMPANY TO THE SPECIAL PURPOSE APPORTIONMENTS FOR FY 96 AND FY 97 PURSUANT TO *N.J.S.A.* 17:1C–19 *ET SEQ.*, AND DEPARTMENT OF BANKING AND INSURANCE ORDER NO. A–97–161.[1]

Superior Court of New Jersey
Appellate Division

Argued January 25, 1999—Decided March 3, 1999.

---

[1] These appeals are consolidated on the court's motion for purposes of opinion.

Before Judges PETRELLA, CUFF and COLLESTER.

*Cynthia J. Borrelli,* argued the cause for appellants the Markel Insurance Companies;  Lexington Insurance Company and Landmark Insurance Company (*Bressler, Amery & Ross,* attorneys;

*Richard R. Spencer, Jr.*, of counsel; *Ms. Borrelli* and *Jennifer E. Birmingham*, on the brief).

*Inge R. Cully*, Deputy Attorney General, argued the cause for respondent Commissioner of Banking and Insurance (*Peter Verniero*, Attorney General, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel; *Ms. Cully*, on the brief).

*Sterns & Weinroth*, attorneys for *amicus curiae*, National Association of Independent Insurers, and *amicus curiae*, National Association of Professional Surplus Lines Offices, filed a brief in A–1460–97T2 (*Elmer M. Matthews*, of counsel; *Susan Stryker, Mitchell A. Livingston* and *Sherry L. Beale*, on the brief).

The opinion of the court was delivered by

CUFF, J.A.D.

In these appeals, surplus lines insurers challenge the constitutionality of a regulation promulgated in 1996 by the Commissioner of the Department of Banking and Insurance which imposes on these insurers a "special purpose apportionment"[2] authorized by *N.J.S.A.* 17:1C–19 to –32. The common thread of the insurers' broad based attack on the regulation is that they have insufficient connections with this State to qualify as an insurer "doing business" in New Jersey. The Commissioner rejected the insurers' challenge to the regulation. We affirm.

In order to place the insurers' challenge to the special purpose apportionment or assessment in context, we briefly review the nature of the surplus lines carriers and their status in New Jersey.

In order to directly conduct insurance business in New Jersey, a New Jersey corporation must be "authorized" by the Commissioner pursuant to *N.J.S.A.* 17:17–1. A foreign corporation seeking to sell insurance to New Jersey residents must be "admitted" by the

---

[2] The "special purpose apportionment" is also referred to as the "special purpose assessment."

Commissioner. *N.J.S.A.* 17:32–1. Whether "authorized" or "admitted," a company engaged directly in the insurance business in New Jersey is subject to the strict regulatory control of the Department of Banking and Insurance (Department). *See Evanston Ins. Co. v. Merin,* 598 *F.Supp.* 1290, 1296–97 (D.N.J.1984). Such approved insurers cover the bulk of insurance risks in New Jersey. *Ibid.*

But some risks fail to attract insurers authorized or admitted in this State, creating a need for so-called "surplus lines insurance," which "involves New Jersey risks which insurance companies authorized or admitted to do business in this State have refused to cover by reason of the nature of the risk." *Railroad Roofing Bldg. & Supply Co. v. Financial Fire & Cas. Co.,* 85 *N.J.* 384, 389, 427 *A.*2d 66 (1981) (footnote omitted). In order to allow New Jersey insureds to obtain coverage of such risks, in 1960 the Legislature enacted the "surplus lines law," which permits out-of-state insurers who are neither "authorized" nor "admitted" in New Jersey to provide the needed insurance through the medium of New Jersey "surplus lines agents." *Ibid.; Howell v. Rosecliff Realty Co.,* 52 *N.J.* 313, 316, 245 *A.*2d 318 (1968); *Industrial Dev. Assocs. v. Commercial Union Surplus Lines Ins. Co.,* 222 *N.J.Super.* 281, 288, 536 *A.*2d 787 (App. Div.), *certif. denied,* 111 *N.J.* 632, 546 *A.*2d 546 (1988).

A "surplus lines agent" is defined as "an individual licensed as an insurance producer with surplus lines authority as provided in [*N.J.S.A.* 17:22A–1 to –12] to handle the placement of insurance coverages on behalf of unauthorized insurers." *N.J.S.A.* 17:22–6.41(a). A "surplus lines insurer" is defined as "an unauthorized insurer in which an insurance coverage is placed or may be placed under this surplus lines law." *N.J.S.A.* 17:22–6.41(b).

The surplus lines law permits coverage to be "exported" to a surplus lines insurer only if the coverage was not obtainable, after "diligent effort," from an "authorized" carrier. *N.J.S.A.* 17:22–6.43. The law defines "export" as meaning "to place in an unauthorized insurer under this surplus lines law, insurance cover-

ing a subject of insurance resident, located, or to be performed in New Jersey." *N.J.S.A.* 17:22–6.41(c). The coverage is then placed with an out-of-state surplus lines insurer by a "surplus lines agent," who must be licensed for that purpose in New Jersey. *N.J.S.A.* 17:22–6.42. Surplus lines agents "are the exclusive conduit through which surplus lines insurers may seek eligibility to receive 'exported' coverages." *Evanston Ins. Co., supra,* 598 *F.Supp.* at 1297. Surplus lines insurers may not contact New Jersey residents within the State; it is the agents who process all requests for coverage. *Ibid.*

A surplus lines insurer must meet stated criteria in order to be "eligible" to receive exported New Jersey coverage. *N.J.S.A.* 17:22–6.45. It is undisputed that the Markel companies, Lexington and Landmark are "eligible." *See* list of eligible surplus lines insurers at *N.J.A.C.* 11:1–34 Appendix A. They enjoy "relatively greater freedom from state regulation, as compared to admitted and authorized insurers." *Evanston Ins. Co., supra,* 598 *F.Supp.* at 1297–98. For example, a surplus lines insurer need demonstrate simply the appearance of sound financial status; an authorized or admitted insurer is subject to thorough examination of its financial status. A surplus lines insurer need only furnish a financial statement showing a minimum surplus; an authorized or admitted insurer must meet certain capital or asset minimum requirements. A surplus lines insurer may charge any rate the market will bear; an authorized or admitted insurer may charge only in accordance with rates and rating systems approved by the Commissioner.

The Department has adopted regulations implementing *N.J.S.A.* 17:22–6.43 (coverage exportability criteria). *N.J.A.C.* 11:1–34.1 to –34.6. The regulations include an "exportable list," a list of thirty-two kinds of insurance for which the Commissioner has determined there is no adequate market among authorized New Jersey insurers. *N.J.A.C.* 11:1–34.6. In addition, the regulations provide for an annual hearing at which changes to the list may be considered. *N.J.A.C.* 11:1–34.3.

In 1995, the Legislature enacted a special purpose apportionment or assessment, by which insurers are annually assessed a fee to help defray the Department's administrative costs. *N.J.S.A.* 17:1C–19 to –32. According to *amicus,* the purpose of the law was to transfer "the responsibility for funding the insurance-related operations of the Department from the State's General Treasury to the insurance industry." *See also N.J.S.A.* 17:1C–19b.

In this statute the Legislature declared that the Department's duty to monitor the financial condition of insurers created the need for "a special purpose funding mechanism." *N.J.S.A.* 17:1C–19a(2). Accordingly, the Legislature declared:

> b. The Legislature therefore intends for the actual incurred expenses of the Department of Insurance for all services related to the department's financial regulation, supervision and monitoring of insurers and health maintenance organizations to be apportioned among insurers and health maintenance organizations *doing business in our State.*
>
> [*N.J.S.A.* 17:1C–19b (emphasis added).]

The act directs the Department of Treasury to calculate the Department's yearly expenses for monitoring insurers, *N.J.S.A.* 17:1C–20a, b, and it mandates that those expenses

> shall be distributed among all of the companies *engaged in business* pursuant to subtitle 3 of Title 17 of the Revised Statutes ... subtitle 3 of Title 17B of the New Jersey Statutes ... and P.L.1973, c. 337 ... *in this State* in the proportion that the net written premiums received by each of them for such insurance written or renewed on risks, in this State during the calendar year immediately preceding, bears to the sum total of all such net written premiums received by all companies writing that insurance or coverage within the State during that calendar year, as reported.
>
> [*N.J.S.A.* 17:1C–20b(2) (emphasis added).]

Although surplus lines insurers are not expressly mentioned, surplus lines insurers are regulated pursuant to *N.J.S.A.* 17:22–6.40 to –6.65, which statutes are a constituent part of subtitle 3 of Title 17.

*N.J.S.A.* 17:1C–32 authorizes the Commissioner to adopt regulations implementing the act. Accordingly, on July 1, 1996, the Commissioner proposed amendments to the existing fee regulations that would establish procedures for collection of the new special purpose apportionment. 28 *N.J.R.* 3223 (July 1, 1996).

The original fee regulations, as they existed before the 1996 amendment, applied to, among others, a surplus lines insurer, *N.J.A.C.* 11:1–32.1(b), which was defined as "an unauthorized insurer in which an insurance coverage is placed or may be placed pursuant to N.J.S.A. 17:22–6.40." *N.J.A.C.* 11:1–32.2. By extending the scope of the fee regulations to include the new special purpose apportionment, the 1996 amendment had the effect of providing that surplus lines insurers were among those entities required to pay the new special purpose assessment.

In its Social Impact Statement accompanying the proposal, the Department did not mention the surplus lines insurers specifically, but it did explain that the aim of the assessment was to charge all entities which received administrative services from the Department:

Insurers, HMOs and certain other regulated entities will be required to pay the applicable apportionment pursuant to N.J.S.A. 17:1C–19 et seq. Insurers and any other person for whom services are provided will be required to pay fees in the manner set forth by these rules as amended. The revised fees more accurately reflect the actual cost to the Department for providing specified services or performing specified acts consistent with the new requirements set forth in N.J.S.A. 17:1C–19 et seq. Moreover, the proposed amendments further clarify the application of these rules to specific entities and specified submissions thereby helping to ensure that persons subject to these rules will be fully aware of their obligations to pay the applicable fee.

The rules will continue to provide that the recipient of a service or act provided by the Department will bear the appropriate expenses to the State of providing the service or performing the act.

[28 *N.J.R.* 3223 (July 1, 1996).]

On October 7, 1996, the proposal was adopted. 28 *N.J.R.* 4482 (Oct. 7, 1996).

In September 1996, the Department issued notices of assessment for 1996 to various surplus lines insurers. The following affiliates of the Markel Insurance Companies (Markel) received the noted assessments: Evanston Insurance, $1,814.56; Essex Insurance, $315.62; Lincoln Insurance, $1,261.59; Carlisle Insurance, $1,487.75; and Investors Special Risk, $110.03. In addition, Landmark Insurance was assessed $145.31 for 1996 and Lexington Insurance was assessed $27,923.90.

Each insurer filed objections with the Department. Before the Commissioner, each insurer argued that the special purpose assessment statute is unconstitutional as applied to them. They argued that none of them had a sufficient presence in the State to support the tax or the assessment. They also contended that the statute as applied to them violates their substantive due process and equal protection rights and constitutes an impermissible burden on interstate commerce. Each insurer also contends that the law by its express terms does not apply to them. Flowing from this argument, the insurers insist that the regulations including them within the scope of the special purpose assessment are *ultra vires*.

Following the submission of written arguments and a conference, the Commissioner concluded that the various objections could be resolved on the papers submitted. Before the Commissioner issued her decisions, the 1997 assessments were issued and each insurer filed objections to those assessments. The Markel companies, Lexington and Landmark have paid the assessments under protest.

In October 1997, the Commissioner issued separate written decisions and orders which rejected the various objections. In each decision, the Commissioner initially focused on the statutory requirement that only insurers "doing business in New Jersey" are subject to the special purpose assessment. She noted that surplus lines insurers are not permitted to operate as freely as authorized or admitted insurers but they are able to do "limited business in New Jersey." Surplus lines insurers insure risks in New Jersey, adjust claims in New Jersey and are represented here by surplus lines agents. Moreover, these insurers are subject to significant filing requirements and regulatory oversight. Therefore, she concluded that an eligible surplus lines insurer met the statutory condition for imposition of the special purpose assessment and the implementing regulations were not *ultra vires*.

The Commissioner rejected their argument that the tax was unconstitutional as applied to them. She found that the surplus

lines insurers transacted business in this State and the amount of the assessment was related to the insurers' intrastate values. In support of her analysis, the Commissioner relied on *Evanston Ins. Co., supra,* which rejected a constitutional challenge to the assessment for the support of the Surplus Lines Insurance Guaranty Fund.

The Commissioner also concluded that imposition of the special purpose assessment did not violate the substantive due process or equal protection rights of the surplus lines insurers. She found that there was a sufficient nexus between the State and the insurance transaction to allow imposition of the assessment. In so holding, the Commissioner factually distinguished *State Bd. of Ins. v. Todd Shipyards Corp.,* 370 *U.S.* 451, 82 *S.Ct.* 1380, 8 *L. Ed.*2d 620 (1962).

The Commissioner also found that eligible and ineligible surplus lines carriers were not similarly situated. In addition, she rejected the argument that surplus lines insurers bore a disproportionate share of the tax burden. She found that these insurers failed to carry their burden of showing that the apportionment places a burden on them that they cannot or should not bear.

The Commissioner also concluded that the application of this apportionment to them did not create an impermissible burden on interstate commerce. In her analysis of this claim, the Commissioner observed that the McCarran–Ferguson Act, 15 *U.S.C.A.* § 1011 to § 1015, clearly reposes with the states the power to regulate and tax the business of insurance.

Finally, she rejected the argument that this assessment was contrary to public policy. The Commissioner noted that in this instance the Legislature had examined the issue and made a policy determination which she was without authority to alter.

■ On appeal, the surplus lines insurers reiterate the same arguments. They insist that surplus lines insurers do not, within the meaning of *N.J.S.A.* 17:1C–20b, do business or engage in business in New Jersey, and that, therefore, the regulation ex-

tending the special purpose assessment to them exceeds the scope of the statute and hence is *ultra vires*. They note that New Jersey's main focus is on regulating surplus lines agents, and that, both historically and currently, surplus lines insurers have been subject to much less regulation than insurers who are authorized to solicit and sell insurance within the State.

In support of this argument, the insurers rely on *Railroad Roofing, supra*. In this case, the Court resolved whether surplus lines insurers were required to become members of the New Jersey Property–Liability Insurance Guaranty Association, a body designed to protect policy holders in the event of insurer insolvency, as required by statute. The act provided that it applied to insurers "admitted or authorized to transact the business of insurance in this State." *Railroad Roofing, supra*, 85 *N.J.* at 390, 427 *A.*2d 66. A subsequent amendment to the act expressly exempted these insurers from participation. The Court was required to resolve whether the act should ever have been applied to them.

The Court concluded that the act did not apply to surplus lines insurers because they were neither "authorized" nor "admitted" to transact business in this State. *Id.* at 392, 427 *A.*2d 66. This conclusion was assisted by reference to the drafting process of a model bill for such funds and the legislative history of the particular statute. The latter included an unequivocal statement that the act did not apply to surplus lines insurers.

*Railroad Roofing* and the general guaranty fund legislation are readily distinguishable from the special purpose assessment legislation. There exists no legislative history which expressly excludes these insurers from its coverage. Moreover, the special purpose assessment legislation does not employ the terms "authorized" or "admitted" insurers, which are infused with a technical meaning in the context of the insurance law of this State. Rather, the legislation uses the broader language of "doing business" and "engaged in business" accompanied by a specific reference to two

subtitles of the existing statutes governing insurers, including the statute governing surplus lines insurers.

■ Moreover, the exclusion of a surplus lines insurer from one legislative scheme does not mean that the Legislature is foreclosed in the future from including these insurers in another legislative scheme. The Surplus Lines Insurance Guaranty Fund Act is an example of this principle. *Evanston Ins. Co., supra*, 598 *F.Supp.* at 1310–11 n. 10.

The legislative purpose of the special purpose assessment also assists our interpretation of the language defining those insurers who are subject to the assessment. As noted, the Legislature has clearly expressed the intention to transfer the costs of oversight of insurers regulated by the Department from the taxpayers as a whole to the regulated entities. *N.J.S.A.* 17:1C–19b. To effectuate this purpose, the Legislature imposed the assessment on those insurers "engaged in business" pursuant to certain designated statutes. *N.J.S.A.* 17:1C–20b(2).

The Commissioner has concluded that for the purposes of this particular assessment a surplus lines insurer engages in business in New Jersey. We do not find such a conclusion unreasonable. The surplus lines carriers insure risks in New Jersey, adjust claims here, and are amenable to suit in this State. These factors indicate a presence in this State directly related to the business of insurance. Furthermore, we must be mindful that the Commissioner is uniquely situated to identify the particular regulatory oversight required by her and her staff of surplus lines insurers. Contrary to the insurers' arguments, the Commissioner's regulatory responsibilities go beyond the initial determination of eligibility. *N.J.S.A.* 17:22–6.45. The Commissioner is required to annually publish a list of all currently eligible surplus lines insurers, and must annually mail this list to each licensed surplus lines agent. *Ibid.* Moreover, annually each eligible surplus lines carrier must satisfy the Commissioner of its continuing eligibility. *N.J.A.C.* 11:1–31 and 11:19–3. Thus, in this particular circumstance, the Commissioner's interpretation of the scope of the assessment finds

support in the language utilized and the express intent of the legislation. Having concluded that the Commissioner's interpretation of the statute is reasonable, the insurers' argument that the regulations are an unauthorized extension of the legislation must fail.

■ The insurers further contend that imposition of the special purpose assessment on them is improper taxation and a violation of their constitutional right to substantive due process. This is so, they insist, because they are out-of-state insurers with insufficient contacts with New Jersey to justify the assessment. The Commissioner responds that the same activity which renders them eligible for this special purpose assessment provides sufficient contacts with this State to support the assessment.

The Commissioner understandably relied heavily on *Evanston Ins. Co., supra,* in which Judge Sarokin rejected similar attacks to *N.J.S.A.* 17:22–6.70 to –6.83, the Surplus Lines Insurance Guaranty Fund legislation. In *Evanston Ins. Co.,* the plaintiffs included two surplus lines insurers (including one of the Markel companies in this appeal) who challenged the constitutionality of the New Jersey Surplus Lines Insurance Guaranty Fund Act. The statute requires surplus lines insurers to make annual contributions to a fund designed to protect New Jersey insureds against insolvency of their surplus lines insurers. The plaintiffs first asserted that the assessments exceeded the scope of due process limits on a state's power to tax out-of-state corporations. The District Court adopted the Supreme Court's two-pronged test for the validity of such a tax:

> A state's power to tax the income of a foreign corporation under both the due process and commerce clauses depends on the existence of "a 'minimal connection' or 'nexus' between the interstate activities and the taxing state, and a rational relationship between the income attributed to the state and the intrastate values of the enterprise." *Container Corp. of Am. v. Franchise Tax Board,* 463 U.S. 159, 103 *S.Ct.* 2933, 2940, 77 *L.Ed.*2d 545 (1983)....
>
> [*Evanston Ins. Co., supra,* 598 *F.Supp.* at 1305.]

In ruling that surplus lines insurers satisfied the sufficient contacts prong, the court reasoned that the State's mandate that

surplus lines insurers operate only through the medium of New Jersey agents was enough to justify exercise of the taxing power.

> New Jersey has required surplus lines insurers to channel their business in the state through designated local agents whose function, in part, is to satisfy the state's regulatory requirements. Surplus lines agents perform a number of services for surplus lines insurers which are required by the New Jersey regulatory scheme as a condition upon the insurers' receipt of in-state New Jersey business.... While the agent is not an employee or general agent of the insurer, he or she performs a sufficient number of agency functions in furtherance of the insurers' operations within the regulatory scheme to elevate the surplus lines insurer over the threshold of susceptibility to state taxation.
>
> [*Id.* at 1309.]

The court found support for this position in *Heublein, Inc. v. South Carolina Tax Comm'n*, 409 *U.S.* 275, 93 *S.Ct.* 483, 34 *L. Ed.*2d 472 (1972). Judge Sarokin reasoned:

> *Heublein* stands for the proposition that a state may, pursuant to a valid regulatory scheme, *require* a foreign corporation to take advantage of the state's benefits, if the corporation is to receive any business from the state at all, and may levy a tax against the corporation because of the benefits provided. In its regulatory scheme, New Jersey has required that any foreign insurer seeking to receive in-state surplus lines business must do so through the mechanism of surplus lines agents. Because these agents, in their operations, take advantage of benefits conferred by the state, the state may tax the insurers which have sought their services.
>
> This conclusion is in complete harmony with the principles of fundamental fairness invoked by plaintiffs. The plaintiffs have voluntarily and actively sought to receive business in New Jersey. They have not only applied to the state for eligibility status, but have sought out surplus lines agents to sponsor them.... There would be no unfairness in taxing them for those benefits purposefully sought.
>
> [*Evanston Ins. Co., supra*, 598 *F.Supp.* at 1309–10 (footnote omitted).]

Regarding the second prong—rational relation between the tax or assessment and the value derived by the company from its New Jersey business—the court held that the premiums received by surplus lines insurers on their New Jersey policies constituted sufficient intrastate value. *Id.* at 1310. The court summarized why New Jersey may exact reasonable regulatory charges from surplus lines insurers:

> All of the characteristics relied upon by plaintiffs to refute the reach of the State of New Jersey over their activities is overcome by the simple fact that they are engaged in insuring persons and property within the state through in-state agents, seek and obtain eligibility to issue such coverage, and are compensated for such

insurance by persons and companies within the state. Notwithstanding the limitations and restrictions imposed upon their activities, the state in the interest of its citizens may impose reasonable conditions upon such companies in order to protect those who utilize their services. They derive an obvious benefit from the placement of such insurance. They may avoid their contribution by foregoing that benefit. On the other hand, they cannot accept the benefit without satisfying the reasonable and justifiable conditions imposed upon them.

[*Id.* at 1296.]

In further support of their substantive due process claim, the insurers rely on *Todd Shipyards, supra.* There the Supreme Court struck down, on substantive due process grounds, a Texas statute that taxed Texas insureds who purchased insurance from insurers not licensed in Texas. *Todd Shipyards, supra,* 370 *U.S.* at 454–57, 82 *S.Ct.* at 1382–84, 8 *L. Ed.*2d at 623–25. The insured in that case was a New York corporation that did business in Texas. The Court reasoned that all aspects of the transaction occurred outside of Texas:

The insurance transactions involved in the present litigation take place entirely outside Texas. The insurance, which is principally insurance against loss or liability arising from damage to property, is negotiated and paid for outside Texas. All losses arising under the policies are adjusted and paid outside Texas. The insurers are not licensed to do business in Texas, have no office or place of business in Texas, do not solicit business in Texas, have no agents in Texas, and do not investigate risks or claims in Texas.

The insured is not a domiciliary of Texas but a New York corporation doing business in Texas. Losses under the policies are payable not to Texas residents but to the insured at its principal office in New York City. The only connection between Texas and the insurance transactions is the fact that the property covered by the insurance is physically located in Texas.

[*Id.* at 454–55, 82 *S.Ct.* at 1382–83, 8 *L. Ed.*2d at 623–24.]

The Court acknowledged that the McCarran–Ferguson Act, 15 *U.S.C.A.* § 1011 to § 1015, established that the Commerce Clause does not bar states from regulating and taxing insurance transactions. But it ruled that Congress did not intend that a state have the power to tax insurance transactions whose significant incidents occur wholly outside the state. *Id.* at 455–56, 82 *S.Ct.* at 1383, 8 *L. Ed.*2d at 624.

In *Howell, supra,* our Supreme Court considered the impact of *Todd Shipyards* on New Jersey's tax on premiums paid to surplus

lines insurers under *N.J.S.A.* 17:22–6.59 (imposing a 3% tax to be collected by the surplus lines agent from the insured). The Court limited *Todd Shipyards* to its facts:

> We think *Todd Shipyards* means no more than this, that insurance transactions of the kinds involved in *Todd Shipyards* ... cannot be taxed or regulated if the only connection with the State is the location therein of the risk insured, but the State may deal with the insurance if activities either in the making or in the performance of the contract occur within its borders.
>
> [*Howell, supra,* 52 *N.J.* at 322, 245 *A.*2d 318.]

The *Howell* Court reasoned that New Jersey's regulatory interest was sufficient to justify the tax:

> Insurance is so essential a part of the area of a State's primary responsibility that the State's power should not depend upon where the parties choose to contract for the insurance or to pay the loss. The State's interest and its responsibility to its citizens should be enough to support regulation and taxation of policies relating to the risks within its jurisdiction. Moreover, the foreign carrier, no less than the admitted company, is aided by the measures the State takes to limit the incidence of the losses covered by insurance. Hence there should be no need to find additional contacts or activities within a State to enable the State to act.
>
> [*Id.* at 324, 245 *A.*2d 318.]

The same considerations which support the constitutionality of the Surplus Lines Insurance Guaranty Fund support the constitutionality of the special purpose assessment on these insurers. Although a surplus lines insurer may not be authorized to do business in this State, as an eligible surplus lines insurer it receives tangible benefits not the least of which is the ability to insure risks in this State. In return, the Commissioner engages in certain oversight functions to protect New Jersey residents. While the regulatory oversight is minimal compared to an insurer "authorized to do business" or "admitted to do business" in this State, the Commissioner is required to determine that the eligible surplus lines insurer "appears to be sound financially and to have satisfactory claims practices, and that the commissioner has no credible evidence to the contrary." *N.J.S.A.* 17:22–6.45(i). The benefit received by these insurers and the expenses incurred by the Commissioner in the discharge of her oversight responsibilities satisfy both prongs of the constitutional test.

Moreover, as in *Howell,* the ruling in *Todd Shipyards* is inapposite to this case. Here, the nexus within the State not only involves the physical presence of the risk, but also the making and performance of the contract within the State. The policies are placed through agents in this State only with insurers previously qualified by the Commissioner as eligible. New Jersey and the interests of its residents are in no sense bystanders to the transaction.

The insurers also argue that the special purpose assessment, as applied to them, violates the federal and state constitutional guarantees of equal protection. They identify two ways in which they are unfairly burdened. First, the Commissioner has levied the assessment only against *eligible* surplus lines insurers even though in some circumstances ineligible surplus lines insurers are allowed to issue surplus lines coverage. Second, surplus lines insurers must pay a tax of 3% of gross premiums (*N.J.S.A.* 17:22–6.59), while admitted insurers pay only 2.15% (*N.J.S.A.* 54:18A–2); hence they already bear a disproportionate share of the insurers' tax burden, which the special purpose assessment exacerbates.

When challenged on equal protection grounds, an insurance statute is subject to minimal scrutiny. The classifications will be upheld if they are rationally related in any conceivable way to some legitimate state interest. *In re Plan for Orderly Withdrawal,* 129 *N.J.* 389, 411–12, 609 *A.*2d 1248 (1992), *cert. denied sub nom. Twin City Fire Ins. Co. v. Fortunato,* 506 *U.S.* 1086, 113 *S.Ct.* 1066, 122 *L. Ed.*2d 370 (1993); *New Jersey State Bar Ass'n v. Berman,* 259 *N.J.Super.* 137, 145–47, 611 *A.*2d 1119 (App.Div.1992). The classification need not be precise or perfect, nor must it be the wisest among all reasonable alternatives; it need only be a reasonable alternative; it need only be a reasonable way of achieving a valid state interest. *Berman, supra,* 259 *N.J.Super.* at 145–47, 611 *A.*2d 1119.

Our review of the regulatory scheme affecting surplus lines insurers reveals considerable differences in the treatment of eligible and ineligible surplus lines insurers. Surplus lines agents may

place risks with surplus lines insurers that are not eligible only in limited circumstances. *N.J.S.A.* 17:22–6.45. Thus, eligible surplus lines insurers have the potential to receive more business than their ineligible counterpart. Furthermore, before accepting the risk, the ineligible unauthorized insurer must deposit with the Commissioner government bonds in an amount acceptable to the Commissioner to protect the New Jersey insured. The eligible surplus lines insurer has no bond deposit requirement. Moreover, the regulatory oversight of the ineligible surplus lines insurer is even less than that imposed on the eligible insurer. The more restrictive conditions on covering New Jersey risks imposed on the ineligible surplus lines insurer readily demonstrates that eligible and ineligible surplus lines insurers are not similarly situated. Therefore, there is a rational relationship for regulatory discrimination between the two.

We also affirm the Commissioner's ruling that the insurers failed to carry their burden on the issue of disparate impact between admitted insurers and eligible surplus lines carriers. We start with the premise that a state may impose a tax on premiums received by an out-of-state insurer while imposing no tax on a domestic insurer. Such a tax can be a legitimate condition to allow out-of-state insurers to do business in that state. *Prudential Ins. Co. v. Benjamin,* 328 *U.S.* 408, 431, 438, 66 *S.Ct.* 1142, 1156, 1159, 90 *L. Ed.* 1342, 1361, 1364 (1946). However, a state may not impose a higher tax on an out-of-state insurer than a domestic insurer if the avowed purpose of the differential is to encourage or favor domestic insurers over foreign insurers. *Metropolitan Life Ins. Co. v. Ward,* 470 *U.S.* 869, 881–82, 105 *S.Ct.* 1676, 1683, 84 *L. Ed.*2d 751, 761–62, *reh'g denied,* 471 *U.S.* 1120, 105 *S.Ct.* 2370, 86 *L. Ed.*2d 269 (1985). On the other hand, a differential between the tax imposed on domestic and foreign insurers is allowed, as long as the more onerous treatment bears a rational relationship to a legitimate state interest. *Id.* at 875, 105 *S.Ct.* at 1680, 84 *L. Ed.*2d at 757.

Here, the State's avowed purpose is not to promote its own insurers at the expense of foreign ones. Rather, it is to obtain reimbursement for the cost of regulatory oversight of surplus lines insurers, a legitimate state interest.

■ Citing *U.S. v. South E. Underwriters Ass'n*, 322 *U.S.* 533, 64 *S.Ct.* 1162, 88 *L. Ed.* 1440, *reh'g denied*, 323 *U.S.* 811, 65 *S.Ct.* 26, 89 *L. Ed.* 646 (1944), the insurers argue that the special purpose assessment is unconstitutional because it impermissibly burdens interstate commerce. They insist that this assessment interferes with the delicate balance of power between the regulatory interests of individual states, one of which regulates the insurer and the other regulates the agent, and interferes with the flow of insurance policies in interstate commerce.

■ The insurers, however, ignore events after 1944, especially the passage in 1945 of the McCarran–Ferguson Act, 15 *U.S.C.A.* § 1011 to § 1015 which "exempts the insurance industry from Commerce Clause restrictions." *Metropolitan Life, supra*, 470 *U.S.* at 880, 105 *S.Ct.* at 1683, 84 *L. Ed.*2d at 761. The act leaves to the states the power to regulate and tax the business of insurance. 15 *U.S.C.A.* § 1012(a). Our Supreme Court has also acknowledged that the Department is not constrained by the Commerce Clause in regulating out-of-state insurers. *In re Plan for Orderly Withdrawal, supra*, 129 *N.J.* at 412–13, 609 *A.*2d 1248; *Howell, supra*, 52 *N.J.* at 328, 245 *A.*2d 318. *See also Evanston Ins. Co., supra*, 598 *F.Supp.* at 1307.

■ Finally, the insurers seek to overturn the assessment as offensive to public policy. The short answer to this argument is that it is not the province of this court to formulate policy or to second-guess the Legislature when it declares that the expense of regulation should be borne by those insurers who write policies covering risks located in this State.

In summary, we conclude that the Commissioner's interpretation of *N.J.S.A.* 17:1C–20(b)(2) to include surplus lines insurers is reasonable. As such, the regulations promulgated to implement

the special purpose assessment are not *ultra vires*. Moreover, the special purpose assessment does not offend a surplus lines insurer's constitutional rights to substantive due process and equal protection of the law. The assessment does not violate the Commerce Clause. Accordingly, the orders issued by the Commissioner which uphold the special purpose assessments against the several Markel companies, Landmark and Lexington are affirmed.

Affirmed.